FURNESS, WITHY & CO., Limited, v. LEYLAND SHIPPING CO., Limited, et al. SAME v. BOSTON ELEVATED RY. CO. THE PLANET NEPTUNE. THE MERIDIAN.

(Circuit Court of Appeals, First Circuit. February 1, 1905.)

Nos. 540, 541.

SHIPPING—DEMURRAGE—LIABILITY OF PURCHASER OF CARGO.

A written contract for the sale of cargoes of coal to be delivered from the ships, which contained no provision with respect to the rate of discharge, bound the purchaser only to receive the coal at a rate which was customary and reasonable under the circumstances; and, where it did so, it cannot be held liable for demurrage which the seller was obliged to pay under the charter parties, requiring a more rapid discharge.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 571, 576.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 70.]

Appeal from the District Court of the United States for the District of Massachusetts.

These were two suits in admiralty, involving liability for demurrage in the case of two steamships—the Planet Neptune and the Meridian—each laden with coal.

The opinion of the District Court in the case of The Planet Neptune, written by Lowell, District Judge, is as follows:

This is a libel for demurrage. The charter party guarantied discharge at the rate of 1,000 tons a day if the vessel could deliver at that rate. The steamer reported at anchor in President Roads at noon on November 26th, not being allowed by the harbor master to proceed to the upper harbor without a berth. The rest of this day should be allowed for berthing, entering at the customhouse, removing the hatches, etc.; and, as November 27th was a holiday, the lay days began on the morning of November 28th. New Ruperra Steamship Co. v. 2,000 Tons of Coal (D. C.) 124 Fed. 937. There were 5,100 tons of coal on board, and so the discharge should have been complete at some time on December 4th. As the discharge under a competent stevedore never reached 250 tons in any one day from any one of the four hatches, it is probable that the guarantied rate was somewhat beyond the vessel's reasonable capacity. I allow six full days for discharge, which is at the rate of only 850 tons a day. The discharge should have been completed at the end of December 4th.

The Boston Elevated Railway Company, the claimant, to whom the coal was sold, has summoned in its vendor, the consignee, and contends that the consignee is liable to it for the demurrage. The written contract of sale contained in the letters which passed between the parties provided that the

coal should be delivered alongside the vendee's pier, or overside in the harbor into lighters. The vendor was thus bound to discharge the coal, and the vendee to furnish wharf or lighters to receive the discharge. The contract did not mention the rate of discharge. If the contract made between a vendor who is to discharge, and a vendee who is to receive discharge, mentions no rate of discharge, both parties are bound only to proceed at a rate reasonable under all the circumstances. The written contract cannot be varied by parol, but, even if parol evidence were here admissible, it would establish only a statement by the claimant that it could discharge at the rate of 1,000 tons a day at its new dock, and that it hoped and expected that the dock would be ready for discharge upon the steamer's arrival. On that consideration, and on that only, according to the testimony of Stewart, the vendor's agent, did Mahler, the vendee's agent, promise to receive 1,000 tons a day. But there was inserted in the contract an alternative method of discharge into lighters, and as to the rate of that discharge Mahler made no suggestion. The alternative was for the benefit of the vendor as well as of the vendee, inasmuch as it permitted the former to employ a vessel, like the Planet Neptune, too large for the vendee's dock. Under these circumstances, even if parol evidence were admissible, and Stewart's testimony were taken as accurate against Mahler's denial, it would still be unfair to hold the vendee to a fixed rate of discharge, where the discharge was into lighters, and could not have been had at the vendee's wharf, even had that been completed, because of the excessive size of the steamer. Was the consignee bound to the vendee to discharge 1,000 tons a day? I think not, and yet both parties were bound or neither. It was said in argument that the consignee, who was bound by the charter party to the shipowner, could not be supposed to have left uncertain the rate of discharge guarantied by the vendee, but a lack of definite stipulation respecting demurrage is not uncommon. See The Viola (D. C.) 90 Fed. 750. It was suggested that, inasmuch as the vendee knew the charter rate of discharge, his contract must be taken as made subject to it. But the parties are still at issue concerning the meaning of the charter party. Because of the congestion of the port, the consignees contended before this court, and may still contend before the Court of Appeals, that they were not required to discharge at the charter rate. This court has decided against them, but the matter is not yet finally determined. The vendor's attempt, here made by parol evidence, to insert in a written contract, apparently complete, an oral agreement which he says was evidently implied from the circumstances of the case, comports ill with his argument just addressed to this court in his contention with the shipowner—that the circumstances of this case relieved him from a like agreement. The situation illustrates the wisdom of the rule which compels parties to abide by their contracts as written. The letter of the vendee to the vendor after the discharge was effected lends some support to the vendor's contention that the vendee admitted its liability for part of the demurrage, but, upon the whole, the acknowledgment is not sufficient to control the plain language of the written contract. Mahler was urging that the congestion of the port excused his delay in furnishing lighters. If the vendee guarantied only that it would receive discharge at a rate reasonable under the circumstances, it was practically admitted at the trial it had fulfilled its contract. The evidence regarding congestion at its wharf of final delivery was too indefinite to affect the result.

In accordance with this opinion, the decree will provide that the consignee pay the demurrage and costs.

In the case of The Meridian the opinion of Lowell, District Judge, is as follows:

This is a libel in personam, brought by the consignees, who paid the demurrage, against the vendee, based upon facts similar to those stated in The Cargo ex Planet Neptune, to which reference is hereby made. The decision here must follow that rendered in the case just mentioned. The steamer Meridian, here in question, was not too large to have discharged at the vendee's dock, but this difference in the facts is not sufficient to change the decision.

Libel dismissed, with costs.

Arthur H. Russell, for appellants.

Arthur P. Stone, for Boston Elevated Ry. Co.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge.   These appeals arise out of two cargoes imported in two different steamers, but covered in one agreement of sale by Furness, Withy & Co., Limited, to the Boston Elevated Railway Company, of 10,000 tons of Welsh small admiralty steam coal. The question before us arises solely between Furness, Withy & Co., Limited, and the Boston Elevated Railway Company.   In each case there was a decree in the District Court in favor of the Boston Elevated Railway Company, and Furness, Withy & Co., Limited, appealed to us.   The origin of the transactions, so far as the same appears by anything written, is shown by the following correspondence:

Boston, Oct. 3d, 1902.

Edward Mahler, Esq., Purchasing Agent, Boston Elevated Railway Co., Converse Building—Dear Sir: We beg to confirm sale, up to 10,000 Tons Welsh Small Admiralty Steam Coal, for shipment last half October and first half November at a price of $5.45 per Ton of 2240 Lbs. delivered alongside your Company's Pier at Lincoln Wharf, or overside in the Harbor into Lighters.

This Price to include Cost, Insurance and Freight to Boston, also United States Duty of 67c. per Ton, and it is agreed that should your Company be able to procure any reduction of the Duty such rebate will be for account of the Boston Elevated Railroad Co.

It is also agreed that should the work of discharge be effected at Lincolns Wharf by the Boston Elevated Railroad Co. a rebate of 20c. per Ton will be allowed for this work.

Kindly confirm and we shall be pleased to be advised should you desire to make further purchases.

Yours faithfully,                               For Furness, Withy & Co., Ltd.,
                                                                Robt. E. Burnett.

Boston, Mass., Oct. 3d, 1902.

Furness, Withy & Co., Ltd., 85 Water Street, Boston, Mass.—Dear Sirs: Have your favor of the 3rd inst. beg to confirm sale to this Company of 10,-000 tons of Welsh Small Admiralty Steam Coal, shipment the last half of October and the first half of November at terms and conditions as stated.

In making charters of steamers, of course we would prefer steamers that would be able to discharge from our Lincoln Wharf Dock. The length of wharf is 283 feet; the dock was dredged for 22 feet at low water.

Kindly advise when charters are made giving the name of steamers, dimensions, etc.   When we are again in the market will advise you.

Yours truly,                                           Ed'wd Mahler,
                                                            Purchasing Agent.

85 Water Street,

Boston, October 4, 1902.

Edward Mahler, Esq., Purchasing Agt. Boston Elevated R. R. Co., 101 Milk St., Boston—Dear Sir: We are favored with your letter of October 3rd, which is in order, except that of course all sales made are subject to the usual strike & Colliery conditions.

We shall be pleased to be advised whenever you are in the market for further importations.

Yours faithfully,                               For Furness, Withy & Co., Ltd.,
                                                                Robt. E. Burnett.

134 F.—52

One cargo came forward by the steamer Meridian, under a charter dated at London on the 3d day of October, and the other by the steamer Planet Neptune, under a charter dated also at London on the 2d day of November, each in 1902. These charters were executed between the owner of the steamers, or the agents of the owner, and Hull, Blythe & Co., coal exporters at London and Cardiff, who were apparently the parties from whom the coal was originally purchased by Furness, Withy & Co., Limited. The charters are of the class known as "Chamber of Shipping Welsh Coal Charter, 1896," and they contain the stipulation found in that class of charters; providing that the cargo be taken from alongside by the consignee at the port of discharge at a rate per day named therein. Furness, Withy & Co., Limited, claims that by its sale to the Boston Elevated Railway Company the latter corporation assumed the burden of that stipulation; but the latter claims that, as between Furness, Withy & Co., Limited, and itself, it was bound only by the implied obligation to discharge with ordinary or customary expedition, which obligation arises as of course on the face of the correspondence. On this issue the District Court found, as we have said, in favor of the Boston Elevated Railway Company.

The opinion passed down by the learned judge of that court went over the facts more in detail than we need to, in view of the disposition which we conclude to make of these appeals. In view of the expression with which its letter of October 3d commences, "We beg to confirm sale," Furness, Withy & Co., Limited, claims that there had been a previous oral agreement covering the terms of the sale, by virtue of which the Boston Elevated Railway Company assumed the burden of the stipulation in the charters to which we have referred, and that this expression adopted that oral agreement, so that Furness, Withy & Co., Limited, is entitled to supplement the correspondence by proof of it. The learned judge of the District Court was of the opinion, first, that, under the rules of law, the correspondence constituted on its face a complete contract, and so could not thus be varied by parol; and, second, that, if it could be varied, Furness, Withy & Co., Limited, failed to support its proposition as to the oral understanding. For the details of these conclusions, we refer to his opinion, which we adopt so far as the issue before us is concerned; supplementing the same with the following suggestions:

In our view, the expression in the letter from Furness, Withy & Co., Limited, of October 4, that is, the words "which is in order," especially in connection with the single exception which follows, show that the correspondence was intended to express and did express the entire contract. Moreover, it is to be observed that the first letter in the series contains the following:

"It is also agreed that should the work of discharge be effected at Lincolns Wharf by the Boston Elevated Railway Co. a rebate of 20c. per ton will be allowed for this work."

This is persuasive from two points of view: First, there is nothing in either charter which in any way corresponds with this special stipulation, or calls for it. Therefore, in the particular of the provison in the charters with regard to the discharge of the cargoes, the correspondence makes a departure so peculiar that, whatever might be the possibility

of maintaining that in some other particulars there was a prior oral agreement to which the words already quoted, "We beg to confirm sale," might be thought to relate, it follows that, on the sole issue between the parties before us, the correspondence is the master.

Again, it is apparent that this particular provision for a rebate arose from the fact that, when or before the correspondence occurred, the Boston Elevated Railway Company had assured the sellers, or had expressed the hope, that it would be able to receive delivery at the wharf named. It is also apparent that, if the coal had been received at that wharf, it certainly could have been discharged at the daily rates stipulated in the charters, and perhaps even more rapidly, and no other advantage could apparently have come therefrom. If the Boston Elevated Railway Company had assumed the stipulations with reference to the daily rates of discharge, it would necessarily have been a matter of absolute indifference to Furness, Withy & Co., Limited, whether the coal was discharged at Lincoln's Wharf or elsewhere, so that in that event the stipulations for rebate would have involved pure gratuities on their part. The stipulated rebate, therefore, is necessarily inconsistent with any understanding, oral or otherwise, such as is now claimed by the vendor of the coal. All this brings the case within the practical rule by which several writings, although informal, taken together, may be seen to constitute a complete legal engagement, as stated by Judge Aldrich, in behalf of this court, in Church v. Proctor, 66 Fed. 240, 241, 13 C. C. A. 426. Consequently, in any view, we conclude that the Boston Elevated Railway Company was bound only to the implied ordinary or customary diligence, and that the decrees of the District Court were correct.

In each case the judgment is: The decree of the District Court is affirmed, and the Boston Elevated Railway Company recovers its costs of appeal from Furness, Withy & Co., Limited.