### CHURCH et al. v. PROCTOR.

(Circuit Court of Appeals, First Circuit. February 2, 1895.)

#### No. 102.

1. CONTRACTS—INTERPRETATION—VARIATION OF WRITING BY PAROL.
   C. & Co. and P. entered into a written contract by which P. agreed to pay C. & Co. a stated price for "what menhaden they land" at a certain wharf, and C. & Co. agreed to furnish menhaden to P. at such wharf. and price, "until he gets through slivering for the year 1888." *Held*, that such contract constituted a complete legal engagement to buy and sell such quantity of menhaden as might be reasonably required in P.'s business, and could not be varied by evidence of an oral agreement of the parties, at an earlier day, to deliver a specific quantity of menhaden daily.

2. SAME—PUBLIC POLICY—SELLING GOODS UNDER FALSE NAME.
   In an action against C. & Co. for failure to deliver the menhaden, *held*, that it was competent to show that P.'s purpose in buying the menhaden was to sell them, under false labels, as mackerel, and thereby deceive the public, contrary to the policy of the law to prevent frauds upon the public, and in violation of a statute of Rhode Island, where the contract was made (Pub. St. R. I. c. 114), imposing a penalty for exporting or selling pickled fish in packages not branded by a sworn packer with its proper name; and that, if it appeared that it was P.'s purpose in buying the menhaden to commit such fraud, no right of action could arise in his favor for breach of the contract by C. & Co.

3. PUBLIC POLICY AS A DEFENSE—GROUNDS.
   The defense of public policy does not proceed so much upon the idea of relief to the defendant as protection to the public, and it is immaterial that the illegal purpose was unknown to the defendant at the time of an alleged breach.

4. SAME.
   It seems that the law will not afford a remedy to a wrongdoer in a scheme the purpose of which is to deceive and defraud the public, whether the party against whom the remedy is sought is himself innocent or guilty of participation in such fraud.

In Error to the Circuit Court of the United States for the District of Rhode Island.

This was an action by Joseph O. Proctor, Jr., against Daniel T. Church and others, to recover damages for breach of a contract. On the trial in the circuit court, the jury gave a verdict for the plaintiff. Defendants bring error.

William G. Roelker, for plaintiffs in error.

William A. Pew, Jr., Thomas A. Jenckes, and Charles A. Wilson, for defendant in error.

Before PUTNAM, Circuit Judge, and NELSON and ALDRICH, District Judges.

ALDRICH, District Judge.　At the time the parties entered into the contract involved in this controversy, Proctor, the plaintiff below, was engaged in a general fishing business at Gloucester, in the state of Massachusetts, and in preparing and placing on the general market different kinds of fish, and especially in splitting and slivering a fish called "menhaden," and placing the same upon the market; and the defendants, at Tiverton, in the state of Rhode Island, were engaged in the business of catching and supplying

menhaden, and possessed superior facilities **for so doing.** On the 3d day of August, 1888, at Tiverton, the parties entered into an agreement in the words following:

"Tiverton, R. I., Aug. 3, 1888.

"We agree to pay Joseph Church & Co. for what menhaden they land at Still's Wharf, Tiverton, R. I., $1.00 per barrel, cash on demand, and they to have, free of cost to them, the heads and guts landed at their dock in a boat that they furnish. Providing crews of steamers refuse to bail the fish, we agree to bail them at no extra charge to Joseph Church & Co.

"J. O. Proctor, Jr.

"Joseph Church & Co., Manufacturers of Menhaden Oil, Guano and Fertilizers.

"Tiverton, R. I., Aug. 3, 1888.

"We agree to furnish menhaden to J. O. Proctor, Jr., alongside Still's Wharf, Tiverton, R. I., at $1.00 per barrel, from now until he gets through slivering for the year 1888.          Joseph Church & Co.

"It is understood that when fish in tubs, Joseph Church & Co. hoist them, and J. O. Proctor hauls them out, and dumps them.

"Joseph Church & Co."

At the trial below, Proctor, contending that the written agreements of August 3d did not contain the entire oral contract between the parties made on an earlier day, introduced oral evidence tending to show that, on a day prior to August 3d, he agreed to take, and Church & Co. agreed to deliver, at least 100 barrels of the menhaden fish on each day during the slivering season in the year 1888. To this evidence the defendants objected, and excepted on the ground that its effect was to change or add to the obligations of the parties as expressed in their written contract. We think the writings, taken together, constitute a complete legal engagement, and that evidence of an express oral agreement between the parties at an earlier day, to deliver a specific quantity of fish daily, was incompetent, for the reason that it reads into the written contract an element not necessarily a part thereof. It seems to us that the writings constitute one of those common agreements whereby one person agrees to supply for a stated price, and another person agrees to buy, all the articles in a certain line required for his family's use or for his business during a certain period. Such a contract is not indefinite, for the reason that the requirements of the family or business may be approximately known, and the quantities are to be determined by the reasonable demands of such family or business. By the terms of the contract expressed in writing, Church & Co. in effect agreed to deliver, and Proctor in effect agreed to receive, such quantities of menhaden as might be reasonably required by his business, to be delivered and received during the period and at the place and price designated in the contract. Proctor was not bound to receive, and Church & Co. were not bound to deliver, more than was reasonably required by the business to which the contract had reference. From the nature of the subject-matter to which the contract related, the quantity was necessarily uncertain. Proctor's requirements were subject to the fluctuations incident to the season and the demands of the market, and Church & Co.'s catch was subject to the weather and other elements of uncertainty incident to their enterprise. The

undertakings of the parties, therefore, like all contracts of this character, were subject to the contingencies which ordinarily affect catching and using fresh fish. Interpreting the writings, therefore, with reference to the subject-matter, and the understood situations of the parties, the contract was complete on its face, in the sense, of course, that it was as complete as contracts regulating undertakings of this character can well be made. The meaning was that one of the parties should receive such quantities as his business required, and the obligation of the other party was to answer such requirements, but in no event to exceed their catch, as their undertaking was subject to the contingencies ordinarily incident to an enterprise of the character of that in which Church & Co. were engaged. In such sense, the contract was a complete obligation, and evidence of a prior oral agreement to deliver daily a specific quantity of fish was inconsistent with its meaning, and therefore incompetent.

So much as to the face of the contract and its meaning as interpreted with reference to the subject-matter generally, but it is said by Church & Co. that, looking further to the subject-matter as disclosed by the record, the contract is altogether void, for the reason that it is against public policy. The ground of this objection, stated generally, is that Proctor, taking advantage of the scarcity of mackerel in 1888, conceived the idea of putting upon the markets generally the menhaden, as a food fish, split and salted, packed in barrels, tubs, pails, and other packages, and variously branded with misleading and deceptive marks and characters, as, for instance, "Alaska Mackerel, for Family Use." Proceeding upon the theory that the facts, if shown, would disclose a contract which would not be upheld, Church & Co. offered evidence to show the character of the marks and brands placed upon the casks and barrels containing the fish, and upon Proctor's objection this evidence was excluded, subject to exception. At the conclusion of all the evidence in the case, the defendants moved for a verdict "on the ground that it appeared from the plaintiff's testimony that the purpose for which he intended to use and did use the fish which were the subject-matter of the contract sued upon was illegal, and against public policy, as being a fraud and an imposition on the public, and * * * illegal, in being in violation of chapter 114 of the Public Statutes of Rhode Island." The court below refused to direct the verdict, and the defendants excepted.

The record does not clearly show that Proctor's deceptive and unwarrantable purpose existed during the entire period covered by the contract, and for this reason the court below could not have properly directed a verdict upon the ground stated in the motion. We think, however, that Church & Co., under the line of defense disclosed, were entitled to show fully the purpose of Proctor at the time of the contract, the use which he made of the fish furnished, and the manner in which they were placed upon the market, and that the court erred in excluding evidence as to the marks and brands upon the casks and barrels. The evidence excluded was competent and material upon the issue raised by the de-

fense, and would tend to show that the public was being deceived and cheated through false and misleading brands and characters used for the purpose of advancing the sale of a product beyond that which would result from its true merit. The point is made that the Rhode Island statute does not apply, for the reason that the evidence shows that the fish in question were designated as "salted fish," while the statute has reference to "pickled fish." This is a distinction which the trade might make, but which, perhaps, the jury would not be required to make, or which, if made, might have been overcome by the jury in view of evidence that the fish were put up for the trade in barrels and casks and in closed packages of various forms. All pickled fish in the ordinary fish business are salted, although all salted fish are not pickled. In view of all the evidence, we cannot say that the jury would not have been warranted in finding that the witnesses in using the term "salted fish" intended to describe the fish in question as pickled. The purpose of the evidence, as to the manner of placing the fish upon the market, was a double one, first, to show that statute of Rhode Island was violated, and, second, to show a scheme which involved a fraud on the consumers of fish as an article of food. As bearing upon the general question whether Proctor's purpose and manner of doing business was such as to render the contract void as against public policy, we think the Rhode Island statute might properly be urged, and that it was material to know whether Proctor's manner of doing business conformed to the statute, or whether it was in plain violation of a statute intended to protect the public generally against fraud and imposition. Chapter 114 of the Public Statutes of Rhode Island, which was in force in 1888, provides, among other things, that "casks for menhaden and herrings shall be of the capacity to hold twenty-eight gallons," and "every cask before being packed or repacked for exportation shall be first searched, examined and approved by a packer, and shall, when so packed or repacked for exportation, be branded legibly on one head with the kind of fish it contains and the weight thereof, or the capacity of the cask with the first letter of the Christian and the whole of the surname of the packer, the name of the town, and the words Rhode Island, in letters not less than three-fourths of an inch long, to denote that the same is merchantable and in good order for exportation." It is further provided, through section 8 of the same statute, that "every person who shall offer for sale in or attempt to export from the state any pickled fish which have not been approved by a sworn packer, or in casks which are not branded as aforesaid, shall forfeit fifty dollars for each offense." It is manifest that this statute regulating the packing of fish in Rhode Island was intended for the protection of the public generally, not Rhode Island consumers alone, but consumers generally. It was to prevent fraud upon the public, and public policy requires that no action shall be successfully maintained in favor of those who pack and ship food fish in open violation of the wholesome provisions of this statute. It is conceded that the plaintiff below not only did not conform to

the statute, but that the packages were falsely marked. The maxim, "Ex dolo malo non oritur actio," fairly and forcibly applies to such a situation. If, upon a jury trial, the fact should be established that the packages prepared and shipped by Proctor were pickled fish, within the meaning of the Rhode Island statute, then for such time as he was actually engaged, or had the purpose to engage, in packing and shipping pickled fish, without conforming to the provisions of the statute, he would not be entitled to maintain his action for damages resulting from nondelivery of the subject-matter intended to be used in violation of the statute law. Bank v. Owens, 2 Pet. 527, 539; Miller v. Ammon, 145 U. S. 421, 12 Sup. Ct. 884; Forster v. Taylor, 5 Barn. & Adol. 887; Eaton v. Keegan, 114 Mass. 434; Pol. Cont. 322; Curtis v. Leavitt, 15 N. Y. 9; Benj. Sales, § 654.

Looking at the transaction aside from the local statute, and independent of the question whether the packages contained pickled or salted fish, the authorities conform to a wholesome and sound rule of public policy that no cause of action shall arise in behalf of a person engaged in a business which is illegal, or which is a fraud and imposition upon the public, and the law will not uphold or enforce a contract, or aid a party, where the purpose is to cheat and deceive the public generally. We feel bound to recognize the modern public policy indicated by the various statutes, as sustained by judicial authority, designed for the protection of the public, and which, in the interest of health and fair dealing, undertake to regulate traffic in food products. The point is taken that the purpose of Proctor to place this product (innocent of itself) upon the market in an improper manner was not known to Church & Co. at the time of the alleged breach, and that, therefore, the objection is not open to the defense. This is not an answer. The defense of public policy does not proceed so much upon the idea of relief to the defendant as protection to the public, by withholding legal remedy from a party contemplating or practicing imposition. It would be a strange rule of law which would extend relief to a particeps criminis, and withhold relief from an innocent party, who seeks to avail himself of its protection when the imposition is discovered. Cowan v. Milbourn, L. R. 2 Exch. 230; Spotswood v. Barrow, 5 Exch. 110; Holman v. Johnson, Cowp. 341. The wholesome and salutary maxim, "Ex turpi causa non oritur actio," has been so far enlarged that it may now be said that the law will not afford a remedy to a wrongdoer in a scheme to deceive and defraud the public, and this modern doctrine does not depend upon the consideration, or the innocence, or lack of innocence, of the party who seeks to interpose the objection. It becomes a defense, and may be interposed whenever the fraud is discovered. It must be observed, however, that it would not always be enough to avoid a contract for a sale of articles innocent of themselves that the party who acquired them, or sought to acquire them, occasionally used them unlawfully. In order that this doctrine should operate in avoidance of a contract, except where the illegality involves life, or offenses of the higher grade, it must appear that the party acquir-

ing the product intended to use it unlawfully when the contract was made, or when possession was sought, or that he was engaged in a general scheme involving illegality, or the general purpose was to use the product in a deceptive and fraudulent manner. The record shows that the "plaintiff testified that under the arrangement contemplated by him, and the contract made with the defendants, the fish were to be landed at Still's Wharf, at Tiverton, in the state of Rhode Island, and immediately there split and salted, and packed up in barrels, tubs, pails, and other packages, and marked and branded and shipped to fill these orders to various parts of the country, and that all the fish that were actually received by him under this contract with the defendants, and otherwise during the season of 1888, at Tiverton, R. I., were so packed and marked there on the spot," and shipped from that point. It also shows that the barrels, casks, and packages were variously branded "Alaska Mackerel," "Russian Mackerel," "California Mackerel," "Family White Fish," and "Fat Family Silversides." It is obvious that the real object of marking the packages thus was to make the product "appear to be what it was not, and thus induce unwary purchasers,"—Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154,—who could not scrutinize the contents, to buy it as mackerel.

Humanity is entitled to know what it buys and consumes. Government is instituted and maintained, and law is administered, for the protection of the people; and justice influenced by enlightened public policy, and controlled by legal principles, requires that contracts shall not be upheld and enforced for the benefit of a wrong-doer, where the subject-matter thereof is designed to be used in furtherance of a business enterprise which contemplates imposition upon the general public through false, misleading, and deceptive brands and labels, placed upon sealed packages of food products in a manner calculated to deceive, and forward the sale of such articles for what they are not. Looking at the record as a whole, however, it does not clearly and distinctly appear when the plaintiff below entered upon such scheme or business, and for this reason we cannot say there was error in the refusal of the court to direct a verdict for the defendants. If upon any subsequent trial this issue should be raised, and evidence adduced in support thereof, we think the jury should be instructed that no damages can be recovered, and no action maintained, covering any period in which the plaintiff below contemplated, or was actually engaged, in placing upon the market the fish described in the contract, under false, deceptive, and misleading brands, designed to attract and induce trade. During the time he entertained such purpose (Cowan v. Milbourn, L. R. 2 Exch. 230, 236; Materne v. Horwitz, 101 N. Y. 469, 5 N. E. 331), or was actually engaged in such business, the law will not help him. The verdict should be set aside for the reasons stated, and it becomes unnecessary to consider the other questions raised by the plaintiffs in error. Judgment of the circuit court reversed; new trial ordered.