### CONTINENTAL PAPER BAG CO. v. EASTERN PAPER BAG CO.[*]

(Circuit Court of Appeals, First Circuit. December 24, 1906.)

No. 635.

**1. PATENTS—INFRINGEMENT—PAPER BAG MACHINE.**
The Liddell patent, No. 558,969, for a paper bag machine, *held* valid as against the claim of prior invention by Claussen, who obtained patent No. 598,497 upon a later application, and also infringed by the machine of the Claussen patent.

**2. SAME—SUIT FOR INFRINGEMENT—EQUITY JURISDICTION.**
The fact that the machine of a patent has never been put into commercial use does not preclude the owner of the patent from maintaining a suit in equity to enjoin its infringement.

Aldrich, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Maine.

For opinion below, see 142 Fed. 479.

Albert H. Walker, for appellant.

Samuel R. Betts, and Francis T. Chambers (Betts, Sheffield & Betts, on the brief), for appellee.

[*] Writ of certiorari granted by Supreme Court March 11, 1907.

Before COLT and LOWELL, Circuit Judges, and ALDRICH, District Judge.

LOWELL, Circuit Judge. This is a bill in equity to restrain the infringement of letters patent No. 558,969, issued to Liddell for an improvement in paper bag machines. The following claims are in suit:

"(1) In a paper-bag machine, the combination of a rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with side-forming fingers adapted to be moved toward or from each other, means for operating said fingers at at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder, the whole operating for the purpose of opening and forming the bottom of the bag-tube, and means to move the bag-tube with the cylinder.

"(2) In a paper-bag machine, the combination of the rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with side-forming fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the sail plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, a finger moving with the forming-plate for receiving the upper sheet of the tube and lifting it during the formative action, power devices for returning the forming-plate to its original position to receive a new bag-tube, and means to move the bag-tube with the cylinder."

"(7) In a paper-bag machine, the combination of the rotating cylinder with the bag-tube provided with one or more pairs of folding-fingers adapted to be moved toward or from each other, a forming-plate also provided with forming-fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, and connecting mechanism for timing the movements of the rotating cylinder and the forming-plate."

In order to decide this case, it is agreed that only claim 1 need be considered, and that the decision upon the other claims will follow that reached regarding claim 1. The Circuit Court found claim 1 to be valid and to have been infringed by the defendant, and it decreed an injunction accordingly. From this decree the defendant has appealed to this court.

The several defenses set up are as follows:

1. The defendant alleges that the invention of the patent in suit, whatever that invention may be, was not made by the patentee Liddell, but by Hunter, his patent solicitor. He contends that from between the formal blanks which had been signed by Liddell, Hunter withdrew the specifications which had made part of the application at the time of its signature, and that afterwards, before filing the application in the Patent Office, Hunter inserted other specifications without Liddell's knowledge. We do not feel ourselves required to review the evidence adduced to support this theory. It is insufficient to establish that the serious crime alleged was committed by Hunter.

2. The defendant alleges that its machine is built in accordance with a patent to Claussen, No. 598,497, and that Claussen's invention

antedates that of the patent in suit; hence he urges (1) that Claussen anticipated·the invention of the patent in suit, and so the patent in suit is invalid; or (2) that the two inventions are different, and so there is no infringement. But Liddell's invention is carried back to January 7, 1896, and no drawing of Claussen made before that time shows any operative combination which anticipates it. For a full treatment of this subject we refer to the opinion of the learned judge of the Circuit Court.

3. The important issue is noninfringement. The patent in suit is concerned with folding the bottoms of S. O. S. paper bags. In the prior art this had been accomplished both by a folding-plate reciprocating upon a plane, and by the operation of fingers upon a cylinder. The folding-plate and the cylinder had never been combined. The complainant urges with much probability that the reason why they not been combined lay in the difficulty of operating a pivoted folding-form upon the surface of a cylinder. Two circles external to each can be in contact at but one point, while, in order that the folding-plate may operate, its end, as it moves upon a pivot, must remain for some distance in contact with the surface of the revolving cylinder. The problem may be solved by causing the pivot or axis of the folding-plate to yield away from the cylinder, or by causing the surface of the cylinder to be depressed away from the folding-plate. The patent in suit adopts the first device, the defendant's machine the second; and the crucial question before the court is this: Under all the circumstances of the case, is the second method, as compared with the first, within the doctrine of equivalents?

The defendant's machine is within the letter of the claims of the patent. These are broadly drawn. The only clause with which we need concern ourselves is that which claims "operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder." The nature of the means is not specified. There is no express reference to the specifications, and in them the patentee twice makes it clear that he does not intend to confine his invention to the particular means described. Thus he says:

"In place of these devices for controlling the movement of the plate, E, relatively to the cylinder, C, the said plate may be moved or operated by any other suitable means. * * * It is evident that the mere mechanism for securing the several movements to the different parts may be modified or changed in various ways without departing from the spirit of the invention, and I do not, therefore, confine myself to the details of construction here shown."

This breadth of claims would imperil the patent were the real invention less broad, but the defendant has not pointed out, and we have been unable to find, any operative combination of a rotary cylinder and a forming-plate oscillating thereon earlier than the patent in suit. If, therefore, the patent is valid, it has a wide scope, and the mechanical arrangement used by the defendant is fairly within its terms.

The machine of the patent in suit is mechanically operative, as was shown experimentally for the purposes of this suit, but it has not been put into commercial use. No reason for the nonuser appears in the evidence, so far as we can discover. The defendant's machine has been an assured commercial success for some years. It was suggested

at the oral argument that an unused patent is not entitled to the protection given by the extraordinary remedy of an injunction. This contention was not made in the defendant's printed brief. While this question has not been directly passed upon, so far as we are informed, in any considered decision of the Supreme Court, yet the weight of authority is in favor of the complainant. Fuller v. Berger, 120 Fed. 274, 56 C. C. A. 588, 65 L. R. A. 381; Bement v. Nat. Harrow Co., 186 U. S. 70, 88, 90, 22 Sup. Ct. 747, 46 L. Ed. 1058; Heaton Peninsular Button Fastener Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Crown Cork Co. v. Aluminum Stopper Co., 108 Fed. 845, 868, 48 C. C. A. 72; Broadnax v. Central Stockyard Co. (C. C.) 4 Fed. 214, 216; Consol. Roller-Mill Co. v. Coombs (C. C.) 39 Fed. 803; Campbell Printing Co. v. Manhattan Ry. Co. (C. C.) 49 Fed. 930.

As we find the claims in suit to be valid and to have been infringed by the defendant, the complainant is entitled to an injunction, and the decree of the Circuit Court must be affirmed.

The decree of the Circuit Court is affirmed, and the appellee recovers costs of appeal.

ALDRICH, District Judge (dissenting). I agree to the conclusion that the patent in suit was infringed, but, notwithstanding infringement, I contend that injunction relief should not be granted because it is an infringement of a paper patent deliberately held in nonuse for a wrongful purpose.

The injunction is not asked against the use of a machine which infringes one which the plaintiff below is making and vending under a patent, but against the use of a machine which infringes a patent under which the plaintiff is not making and vending, and one which the plaintiff intends to withhold from the public.

The manifest purpose is to withhold the infringed device from commercial use with the view of forcing another into the paper bag industry; and thus the concrete question is whether equity by injunction will aid such a purpose with respect to a legal right.

There is no pretense in this case that equitable aid is asked to protect from infringement the patent the plaintiff is using in its business. In the aspect most favorable to the plaintiff, the relief sought is injunction protection to a business or an industry built up in using a particular invention, and through acquiring and holding in deliberate nonuse a competing invention by way of protection.

It results, therefore, that a court of equity is asked not to protect from infringement the statutorily intended monopoly of the right to make, use, and vend under a particular patent, but to protect a monopoly beyond and broader than that, a monopoly in aid of the rightful statutory monopoly of the patent in use. The proposition involves the idea of a secondary monopoly maintained to stifle patent competition in the trades and industries, and thus contemplates a condition which at once contravenes the manifest purpose of the Constitution, and a monopoly of a kind and breadth and for a purpose in no sense ever contemplated by the statutory contract which safeguards the legal right to make, use, and vend under a particular patent.

My contention is not that an individual or a corporation may not buy and hold competing patents and control them in a strictly legal sense, and recover such damages at law for infringement as the rules of law accord to the owner for the invasion of such a legal right, but that equity should not by the arm of injunction aid the owner in a purpose to control and suppress invention and to retard intended benefits which in the ordinary course of manufacture and trade, uninfluenced by unconscionable and inequitable control, would naturally flow in trade and commerce.

The legal right of ownership and right of legal control of patent rights is not at all denied; but why should equity through injunction help a man or a corporation to so unreasonably exercise the legal right as to effectuate the withdrawal of patents from their position in the field of utility, to the end that a single and perhaps an inferior right or monopoly shall be exclusively forced into business and upon the public, for the pecuniary gain of private ownership at the expense of the public? The primary purpose of the framers of the Constitution was not unconscionable private pecuniary gain, but to encourage invention in the interests of general business and of the public, and the act of Congress which followed soon after was to protect the right to make, use, and vend, under a given patent, thus stimulating invention in the public interest, and there was no thought of giving countenance to the idea of acquiring and locking up inventions, and improvements upon inventions, to the end that the general benefits of invention should be turned back; and the idea that a court of equity should help to accomplish such a result is contrary to the spirit of equity, and offends public policy.

Equity may look to the object of litigation and to the object of the relief sought, and thus, as already said, it is found that the primary and substantial object of the litigation here is not to protect the paper patent in suit, which is locked in nonuse, but to aid the patent monopoly of another patent which is not in suit, one which is in use, but not infringed—all to the real and manifest end that patent competition shall be stifled and destroyed, and that the business public engaged in the paper-bag industry shall be driven to the use of a particular patent machine not covered by the patent in litigation and one not infringed.

Simple nonuse is one thing. Standing alone, nonuse is no efficient reason for withholding injunction. There are many reasons for nonuse which, upon explanation, are cogent, but when acquiring, holding, and nonuse are only explainable upon the hypothesis of a purpose to abnormally force trade into unnatural channels—a hypothesis involving an attitude which offends public policy, the conscience of equity, and the very spirit and intention of the law upon which the legal right is founded—it is quite another thing. This is an aspect which has not been considered in a case like the one here.

One may suppress his own. This is unquestionably decided, but when the suppression is for a wrongful purpose a taint is created, and a court of equity may look beyond the fictitious issue, in respect to protection of a paper patent which is locked up, and to the underlying and substantial issue, which involves the question whether equity will

help a monopolistic exclusion of a beneficial right from public use, when the purpose is to force another and a different thing upon the public, under conditions which at once overturn the whole theory of government protection to patents intended to stimulate invention, to the end that the benefits of discovery shall, under reasonable competitive patent conditions, flow to the trades and industries.

Extreme illustrations may be used to test the reasonableness of a legal or an equitable proposition. If it is legal and equitable for individuals or corporations to buy and suppress one patent for the purpose of forcing another into trade and into control in a given industry, they may upon the same legal and equitable logic buy and suppress all, together with the public interest, and it is when the real and substantial purpose is not to safeguard a particular right, but to suppress it under the forms of law and to arbitrarily force another, that the equitable situation changes.

Under the Constitution and the statute in aid of the constitutional provision with reference to inventions and discoveries, it was intended to stimulate art and invention under competitive conditions by protecting the right to each inventor, or each owner, to make, use, and vend, and, if equity is to aid in stultifying this plain intent through affirmative relief by injunction, by protecting patent aggregations held in deliberate nonuse for the purpose of excluding all patent benefits except such as the holder sees fit to bestow, it will help to overthrow the intended meritorious patent competition under normal conditions in trade, and will help to deny the intended benefits to the public.

In the case at bar the patent in suit is deliberately suppressed. There has been no attempt to put it into commercial use. It relates to the very important and far-reaching paper bag industry. The only machine ever made under the patent was one made at an expense of many thousand dollars for use as an exhibit in this litigation.

The learned Judge Putnam, in the Circuit Court, under the view expressed in his opinion, that in patent suits the court "stands not only for the parties, but, in a certain sense, for the public," and "the interests of the public," expressed grave doubt upon the question whether the case at bar was one for injunction, but apparently, partly because an accounting is asked for and partly in recognition of what seemed to him as a crystallization of the authorities in other circuits in favor of injunction relief under such circumstances, granted an injunction with hesitation and with the reservation that he saw no relief for the respondent in this direction, "unless in some way obtained from the Supreme Court."

Upon the very important question of nonuse, and as to the purpose of nonuse, the learned judge forcibly stated his findings as follows:

"The bill asks for both an injunction and an account; and, though no issue has been made as to jurisdiction in equity for the account, it is maintained that, under the circumstances, equity will not take jurisdiction for an injunction. We have stated that no machine for practical manufacturing purposes was ever constructed under the Liddell patent. The record also shows that the complainant, so to speak, locked up its patent. It has never attempted to make any practical use of it, either itself or through licenses, and apparently its proposed policy has been to avoid this. In this respect it has not the common excuse of a lack of means, as it is unquestioned that the complainant is a

powerful and wealthy corporation. We have no doubt that the complainant stands in the common class of manufacturers who accumulate patents merely for the purpose of protecting their general industries and shutting out competitors."

Injunction applications are addressed to the discretion of the court, a discretion to be exercised under legal rules and upon equitable principles, and the attitude of the party to the situation as disclosed in argument has a proper bearing upon the question whether the injunction arm should be exercised in his behalf.

Upon the question of nonuse the appellant took this position upon its brief:

"No machine was ever built under the Liddell patent prior to the beginning of this suit; and no machine claimed to be an infringement of the Liddell patent has ever yet been built by anybody, except that the defendant's self-opening square paper bag machines were claimed in this suit to be such an infringement. When Mr. Stone gave his theoretical expert testimony upon the characteristics of the Liddell patent in January, 1903, no machine had ever existed anywhere which conformed to the mechanism described and delineated in that patent. That patent at that time was nearly seven years old, but it still remained what it had always been, a paper proposition, and nothing more."

And in reply to the oral argument of the appellant upon the question of nonuse counsel for the appellee said:

"We do not make these machines because we do not need them. We hold the patent to control."

The oral statement of counsel adds nothing to the findings of the Circuit Court upon that point, except to emphasize the idea of the purpose of the holding. In support of his position counsel cited Bement v. National Harrow Co., 186 U. S. 70, 90, 22 Sup. Ct. 747, 46 L. Ed. 1058. It is not understood that Bement v. National Harrow Co. at all supports such a position. That case was not one of nonuse, and only involved legal rights, and the question whether certain contract provisions as to the character and terms of the use under certain patents created a condition prohibited by the Sherman act. The Supreme Court in support of the right of control was manifestly dealing only with the question of legal right, and in no sense with the question of equitable aid. Moreover, that court, in order to limit the effect of the authority to the particular situation before it, guardedly left open the question of the legal effect of the contemplated aggregation of legal rights under the incomplete escrow agreement.

It cannot be seriously urged that the Supreme Court has passed upon the question of equitable injunction relief in a case like this. Indeed, Judge Grosscup in his forcible dissenting opinion in Fuller v. Berger, 120 Fed. 274, 281, 56 C. C. A. 588, 65 L. R. A. 381, which was a case of misuse, decided since Bement v. National Harrow Co., says, "The Supreme Court has not yet passed upon the question of nonuse." And Judge Lowell in the majority opinion in the present case, as well as Judge Putnam in the Circuit Court, treats the question as one not covered by any authority of the Supreme Court.

Grant v. Raymond, 6 Pet. 218, 8 L. Ed. 376, was likewise a case at law, and in that case Chief Justice Marshall, in speaking of the legal right and the duty of the court to uphold the patent contract, carefully

guarded his observation by the important qualification, "if this can be done without transcending the intention of the statute, or countenancing acts which are fraudulent, or may prove mischievous." This all important qualification of the right of legal control appears in the paragraph quoted approvingly by the Supreme Court in Bement v. National Harrow Co. It would thus seem beyond question that the Supreme Court was far from holding that a court of equity should grant an injunction in aid of a scheme to shut out competitors through holding patents intentionally stifled in nonuse.

Moreover, in the case referred to, Marshall, in speaking of the constitutional purpose to promote the progress of science and useful arts, and of the exclusive right of authors and inventors to their writings and discoveries, and of "the sole and exclusive right and liberty of making, using and vending to others to be used," said:

"It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions."

It is perfectly clear that the eminent jurist was only speaking of protection in the right to make and use, and in the right to vend to others to be used. That was the reward of which he was speaking, and he simply declared an exact legal and equitable truth. It is not conceivable that he had in mind the idea of augmenting such reward by equitable encouragement of a scheme to aid the rightful constitutional and statutory reward or monopoly through acquirement and suppression of other inventions and of competing patent improvements and devices for doing the same work.

In the same line, and in support of the idea that the Constitution and the statute contemplated an exercise of the right, is the observation of Judge Shipman in Magic Ruffle Company v. Douglas, 2 Fish, Pat. Cas., p. 333 (Fed. Cas. No. 8,948):

"The public who thus through the law secure to the inventor the exclusive property in his invention for a limited period receive in return either new, more valuable, or cheaper production during the life of the patent."

And we find further support in the reasoning of Kent in Livingston v. Van Ingen, 9 Johns. (N. Y.) 507, 586, that the general idea of equitable protection of a legal statutory right is based upon a supposition that protection attaches to the right when in actual possession and exercise, and the principle there expressed by Chancellor Kent was quoted approvingly by the Supreme Court in Root v. Railway Company, 105 U. S. 189, 192, 26 L. Ed. 975.

Still further, Judge Lurton, in the Heaton-Peninsular Button-Fastener Case, 77 Fed. 288, 294, 25 C. C. A. 267, 273, 35 L. R. A. 728, says:

"That the grant is made upon the reasonable expectation that he will either put his patent to practical use, or permit others to avail themselves of it upon reasonable terms, is doubtless true."

And in New York Paper Bag Mach. & M. Co. v. Hollingsworth & W. Co., 56 Fed. 224, 231, 5 C. C. A. 490, Judge Putnam doubts whether, under circumstances of unexplained nonuser, the case is not one of mere legal right, where the party is left to remedies at law, if entitled to any relief at all.

The Heaton-Peninsular Button-Fastener Case, 77 Fed 288, 25 C. C. A. 267, 35 L. R. A. 728, upon which reliance is placed by reason of its dicta, was not a case involving deliberate nonuse of patent rights in aid of the statutory monopoly under other patents, nor did it involve the question of injunction under such circumstances, but was a case involving the validity of certain restrictions imposed upon the use of the patent machine. Still, if the shoe machinery illustration used at page 295 of 77 Fed., page 274 of 25 C. C. A. (35 L. R. A. 728) carried to its logical conclusion would operate to give legal and equitable control in deliberate nonuse of all patents relating to the shoe industry, to the end that such a holder might deal out to the public the product of a single patent, or even an unpatented article, thus denying the public all benefits of invention, I should be quite unable to agree to such a result as a thing possible under a jurisprudence which from time immemorial has recognized the wisdom and necessity of competitive conditions in trade and manufacture, and has assumed upon grounds of public policy to protect the public right of freedom in business.

In the Broadnax Case (C. C.) 4 Fed. 214, it was simply a question whether practical use was necessary to preserve a patent, and involved no consideration of the question as to the effect of deliberately holding in nonuse to aid another patent, nor did the Consolidated Roller Mill Company Case (C. C.) 39 Fed. 803, involve any question like the one here. In the Campbell Printing Press & Manufacturing Company Case (C. C.) 49 Fed. 930, there was no pretense of a wrongful purpose, and the nonuse was satisfactorily explained, and Judge Lacombe's criticism of Judge Blodgett's reasoning in Hoe v. Knap (C. C.) 27 Fed. 204, has no force upon the question now under consideration, because in Hoe v. Knap there was no pretense of a deliberate holding in nonuse in aid of another right; and in the Crown Cork & Seal Company Case, 108 Fed. Rep. 845, 868, 48 C. C. A. 72, the patent was recently issued, and the delay in manufacturing was explained by litigation and other obligations removing implications unfavorable to the patentee by reason of the delay.

So it would seem that in none of these cases was the question of equitable injunction relief, under circumstances where the patent was held in nonuse for the sole purpose of control in aid of another patent, either considered or decided.

The supposition would seem to be logical that if a party may acquire and hold a single competing patent in deliberate and intentional nonuse for the purpose of overthrowing competitive conditions, and may have equitable injunction to that end, he may acquire and suppress all competing inventions and have equitable aid; and it would seem not to have been authoritatively decided that individuals or corporations may acquire all useful inventions relating to a particular industry, or all inventions relating to a particular service in the field of a given industry, and force into business and manufacturing establishments, upon railroads, into government establishments, and the various industries of the country a single appliance or a particular machine through an artificial necessity and demand created in its behalf through a monopoly of patent statutory and competing rights intentionally held

in nonuse for such a purpose, and that they may have the monopoly influenced in behalf of such a scheme through injunction relief in equity.

Carrying equitable protection to such a second monopoly, maintained in deliberate nonuse in aid of the one intended, would stifle the constitutional purpose, and reverse the whole constitutional and statutory project, in which the primary and leading purpose was to benefit the public and business by giving to the patentee a safely guarded single monopoly of the right to make, use, and vend under his invention.

As said by Mr. Justice Brewer in State of Missouri ex rel. B. & O. Telegraph Co. v. Bell Telephone Co. (C. C.) 23 Fed. 539, 540, "there is no peculiar sanctity hovering over or attaching to the ownership of a patent. It is simply a property right, to be protected as such," and immunity from the lawful and proper exercise of patent rights cannot be claimed solely because of the incident of the patent. Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115; Webber v. Virginia, 103 U. S. 344, 26 L. Ed. 565. Therefore, in the view most favorable to the holder of cumulated inventions, an aggregation of titles to patent rights, rights created by statute, is no more solemn or sacred than an aggregation of various individual legal rights under government land grants. In neither case is it the holding of the legal title in the aggregate alone that involves an inequity or a wrong, but it is the purpose to monopolize, and deny to the public, rights which the government and the law fairly intended that the public should enjoy, that offends equity and makes a case in which the holder of the legal right should not be aided by an injunction, but left to his legal remedies. The application of such a principle to such a situation involves neither the enunciation of a new rule nor the expansion of equitable principles. It is only an application of an ancient, familiar, and simple doctrine in equity.

There is a broad difference between ownership and monopoly of strictly private rights and ownership and monopoly of rights into which the public interest and the public rights enter, and, as is often pointed out, artificial rights created by statutory law are more subject to regulation and control by government and law through affirmative and negative relief in equity than the natural rights of the individual —rights which inhere in the individual. Neither should be violated, but both may be regulated when used for a wrongful purpose.

My contention involves no suggestion that cumulation of titles, whether they are artificial or natural, is in itself wrongful. It only becomes wrongful when the purpose of the acquisition is wrongful. When the purpose is not to enjoy the right as such, but to force other rights and to create abnormal conditions in the world of business, then a court of equity should not follow the legal right with a view of aiding the purpose.

The case of Edwards v. Allouez Mining Co., 38 Mich. 46, 31 Am. Rep. 301, which involved private rights and a situation into which the element of public interest did not at all enter, fully sustains this position. In that case land was bought by an individual with a preconceived purpose to force a sale of it upon the defendant. He did not want it for a homestead or for business property, but for the money he

could compel the defendant to pay for it by reason of a nuisance which he knew existed at the time of the purchase. Failing through negotiation to secure more than the right was worth, he asked equitable aid by way of injunction, and the very able and interesting opinion of Judge Cooley made the case turn by reason of the purpose against equitable relief, observing, among other things:

"We cannot say in this case that complainant had no right to buy, but we can say, as we do, that when he comes demanding strict legal rights he shall have those, but no more. He is entitled to his rights under the rules of law, but he is entitled to nothing of grace."

See, also, Jencks v. Quidnick Co., 135 U. S. 457, 460, 10 Sup. Ct. 655, 34 L. Ed. 200; Bassett v. Company, 47 N. H. 426, 442.

Aside from legal abstract, the act of acquiring a valuable right, into which the public interest enters, not for use, but to destroy or withdraw from use, alone involves a certain measure of wrong, because, upon natural and fundamental grounds, it is in a sense wrong to buy and withhold a thing of public interest and benefit, and when the fundamental wrong, based upon legal abstract, is augmented by the purpose to create a situation in restraint of normal conditions which shall operate to force a use based upon another and different right into business and upon the community, the right to equitable relief in aid of the abstract right is forfeited.

The equitable wrong does not reside in holding the aggregated title as such for its value as title, but in the purpose to hold the aggregation over and in restraint of the public, not for the intrinsic value of the right itself, but for the purpose of adding value and potency to a monopoly which is already held in respect to another right. Such a situation involves a combination of interests under a single control, or, in other words, a "unification of interest" (National Cotton Oil Company v. Texas, 197 U. S. 115, 129, 25 Sup. Ct. 379, 49 L. Ed. 689) and "unified tactics," with the idea of arbitrarily creating and emphasizing a necessity for the use of a thing, like a particular patent, rightful in itself, through the monopolistic control and suppression of other things, like other patents, which might otherwise come into competition with it.

I am not unmindful of the generally recognized rule that equity follows the law and the legal right, but this only means that equity will follow the law and the legal right only when law and the legal right are not wrongfully, oppressively, or inequitably employed to accomplish wrongful and unconscionable results. Legal rights may be so aggregated with a wrongful purpose as to become a menace to trade and destructive to free competition in business, and it is then that equity will not follow and aid the legal right.

The expression is a familiar one in the books that a patent situation is one which involves a contract between the patentee and the public; but without regard to whether that is a strictly accurate statement of the nature of the contract, in view of the constitutional and statutory public purpose, the proposition that the public interest, in a sense, enters into such a situation, cannot be successfully disputed, and, as already observed, at best, a party who rests his right upon a public statute and a situation into which the public interest enters does not

hold his right strengthened by a greater weight of sanctity than does a party who rests his title upon the natural private right to acquire and hold private property, a right into which the public interest does not enter.

The spirit of equity encourages the idea, and it is high time that a court of equity charged with the reasonable and responsible exercise of a powerful and salutary function in government should emphasize the idea that business enterprise and single rights, without regard to the question whether a given right is patent or natural, corporate, or individual, should be protected by injunction only in the opportunity to freely run the course upon inherent merit in the natural and ordinary channels of business, unrestrained and unobstructed by forces involved in unreasonable and inequitable aggregations of rights calculated to force upon the public artificial and arbitrarily controlling conditions; and that equity consequently will not through injunction aid forces involved in unreasonable cumulations, especially in respect of artificial rights intended to restrain and obstruct freedom in business, and to force a particular right or a particular thing beyond its merit, out of its channel, beyond the status of statutory protection to which it is entitled, and into a field of protection created by a second monopoly of other artificial rights deliberately acquired and held in nonuse for the purpose of forcing upon the public arbitrarily controlling and absolute conditions in business.

Let us see where the doctrine of absolutism of control contended for in respect to rights which affect the public would lead. Extreme illustrations, as already said, test the logic and safety of a rule. If the public and equity are wholly and irretrievably at the mercy of an arbitrary force of absolutism residing in abstract legal, individual or corporate ownership of cumulated artificial or statutory rights, acquired and held not for use, but for purposes of monopoly and control, a particular patent appliance may be forced exclusively into use through a monopoly of improvements and useful discoveries involved in competing inventions held and controlled in nonuse for such a purpose. And, if the contention is sound, such a wrongful and secondary monopoly, existing as a negative and restraining force in the field of industrial art and of invention, contrary to the manifest purpose of the Constitution and of the act of Congress encouraging invention and discovery, and conceived as something to operate as an arbitrary and potential aid to the intended statutory monopoly of the single right to make, use, and vend under a particular patent, may have the help of the injunction arm of equity. Such a situation would at once arrest development and progress in the industrial system, and offend the idea of useful jurisprudence.

Conditions like these, deliberately created for purposes of control in business, are based upon artificial, arbitrary, and inequitable lines, which invade and hamper the natural, fundamental, and essential rights of a business community to have reasonable competitive freedom, not only in trade and commerce, but in the field of industrial art as well. Such a situation involves an aggregation of artificial, or, in other words, statutory, rights for the sole purpose of forcing upon the business of the country a given product or a given device, and

as such it becomes a business scheme altogether intolerable upon an equitable view and upon equitable principles; and thus it is something to which a court of equity should not give affirmative aid through injunction in the interest of an ulterior right intended to be influenced and accentuated by such artificial aggregations at the expense of the general public and of necessary and reasonable competitive conditions in the open field of commerce and industry.

If it is otherwise, a party holding a single patent for a particular automatic air brake, in respect to which no one would question his right to equitable protection in making, using and vending the particular thing covered by the patent, but not satisfied with the scope of this statutorily intended monopoly, may entirely destroy and wholly overthrow wholesome competition between things in the field of invention and discovery through acquiring all patents for other devices, together with all patents for improvements intended to do the same service, and without regard to the merit of the appliance covered by his original patent—without regard to hazard to life in its use in connection with the public passenger-carrying service—may force his particular thing upon all railroads through an intended monopoly of quasi public statutory rights held in harmful nonuse, and may call upon a court of equity to help him do it.

In equity consequence of interference or noninterference by way of injunction is always something proper to be considered, and this is especially so with reference to situations into which general public interest at all enters. Refusing injunction in aid of forces involved in artificial situations voluntarily and intentionally created to arrest development and suppress competitive conditions in a given industry;— situations based upon the conceived idea of having something in its nature calculated to influence normal conditions of demand and trade, and to augment the necessity and demand for a particular quasi public right in use through a monopoly of competing quasi public rights held in deliberate nonuse for that purpose—will not be harmful, but he'pful, to general business and the general industrial pursuits. It would only be harmful to those whose purpose it is to harm business and the industrial pursuits by inequitably subjecting such interests to the injustice of noncompetitive and monopolistic conditions, and the harm to those creating noncompetitive conditions in the field of useful invention and discovery through an intentional withholding of public benefits for a wrongful purpose only results from leaving them to stand upon their legal rights, unaided by equity.

The very conception of such a holding involves the idea that a party, not satisfied with the enjoyment of the statutory monopoly of the invention covered by a particular patent grant, and notwithstanding the important and controlling consideration, at least so far as equity is concerned, that neither the Constitution nor the statute ever intended anything more as a part of the statutory contract, or contemplated any further safeguard to the patentee as a thing possible, may aid the statutory monopoly by another and a secondary monopoly of competing patent rights held in deliberate and intentional nonuse, and may

150 F.—48

ask equity through injection to assist in furtherance of such a purpose.

Under such circumstances equity is not asked to protect the patent monopoly intended by the statute, but the broader monopoly which in conception and extent offends the statute and the conscience of equity as well. This is so because the ulterior and substantial purpose is not to protect the infringed patent that is locked up, but to force the public and the trade to use another patent. Thus is presented an inequitable situation which a court of equity should at least leave where it finds it.

Against the idea that the holder of the legal right should be left to legal remedies, the suggestion is made that legal remedy in a patent case would involve a multiplicity of suits; and should a holder of the legal right be subjected to such inconvenience? The answer is "Yes," if the legal right is held in nonuse for a wrongful ulterior purpose in respect to another right, and to the end that that particular right shall have the exclusive field, and remain as the only invention available to the public. It must always be borne in mind that the relief sought is not that the patent in use, as a rightful monopoly, shall not be infringed, but that other patents may be held in nonuse under equitable protection, so that the new discoveries which they cover shall not come into competition with the discovery in use. Under such conditions the appeal to equity is groundless. Reasonable protection of the rightful monopoly in use does not require equity to hold other discoveries in nonuse, to the end that the particular invention in use shall be the only one available to the public. It is no sufficient answer to say that, as the statute intends a monopoly, the situation is sui generis, because it is not the rightful sui generis statutory monopoly in use that is equitably objectionable, but the statutory monopoly in suit, held in deliberate nonuse in aid of it, that is equitably objectionable. While the legal statutory monopoly of the invention covered by the paper patent in suit is in and of itself rightful, when such rightful statutory monopoly is not to be exercised, but held over the public, entrenched in deliberate nonuse for an ulterior purpose with respect to another right, such rightful monopoly becomes harmful, and, as such, an inequitable one.

To thus force business through acquirement and nonuse of titles, based upon a public statute intended to promote invention and protect use, is quite as inequitable and harmful as is influence of trade through deceptive trade-marks, which equity will not aid.

Trade-mark rights are legal property, and, under a general rule, protected by equity. But, when it is found that the underlying purpose is to wrong the public under the guise of a trade-mark, equity rightfully withholds support; and the books are full of analogous situations where both law and equity have refused to follow the exercise of the legal right into the field of wrong and oppression to business and communities. This is upon the idea that neither the law nor equity follows the legal right in order that it shall be established and maintained where the purpose is to fix a harmful use or control upon business or upon the public. High on Injunctions, §§ 1092–1095; California Fig Syrup Company v. Putnam (C. C.) 66 Fed. 750; Id.,

69 Fed. 740, 16 C. C. A. 376; Manhattan Medicine Company v. Wood, 108 U. S. 218, 223, 2 Sup. Ct. 436, 27 L. Ed. 706; Church v. Proctor, 66 Fed. 240, 13 C. C. A. 426; Connell v. Reed, 128 Mass. 477, 35 Am. Rep. 397; 2 Austin on Jurisprudence (3d Eng. Ed.) 668; Phelps, Jurid. Eq. Abridged, § 239; 1 Pomeroy's Equity Juris. (1st Ed.) § 427; Leather Cloth Company v. American Leather Cloth Company, 4 De Gex, J. & S. 137, 142, 144; s. c., 11 H. L. Cas. 523. In the last case cited, Lord Westbury, in turning the case upon the wrongful purpose in connection with the property which the plaintiff sought to protect, says, "He loses, and very justly, his right to claim the assistance of a court of equity"; and in Church v. Proctor, 66 Fed. 240, 245, 13 C. C. A. 426, 431, we held at law and upon legal principles that the legal right of contract would not be upheld for the benefit of a wrongdoer in respect to a business enterprise which contemplated imposition upon the general public.

I again state, for purposes of illustration, the proposition that legal, artificial patent rights, based upon statute law giving monopoly and control for a limited time, have no greater sanctity as rights than natural legal rights in the hands of an individual, which he may monopolize and control without limit as to time. Both hold good as legal rights and may be controlled by the owner, but courts of equity should not as to either class aid the owner in a purpose to acquire and so use his legal rights as to unreasonably control trade.

Perhaps a man may legally acquire and destroy a product, which, under natural conditions, would create trade and be consumed by the public; but will courts of equity aid? Such an equitable question of injunction cannot be determined upon the principle of technical, abstract, legal right, because, if it were to be determined upon the single idea of absolute, legal right, one might at his own absolute will dominate and dismantle competing business establishments.

Aside from patent right conditions (conditions at best not involving rights superior to ordinary property rights), suppose a scheme to hold and dominate prices in the fruit market through regular arrivals in a given harbor of stated cargoes of fruit, and suppose by reason of stress of weather the arrival of vessels had been delayed or accelerated, and that two vessels arrive when only one was expected, and suppose that the owners, to the end that the market should not be overstocked and prices fluctuated, should deliberately dump one of the cargoes, under such circumstances it would not be supposed that any one would contend that the act in itself was not in a sense wrong, still such an act could perhaps be defended upon the ground of legal, abstract right of ownership and control. But whether equity, as an instrument of government for the reasonable protection of legal rights, would aid in a consummation of the scheme through the arm of injunction by restraining interference with the dump, is quite another question.

Again, it is well understood in the wood-pulp industry that at least 80 per cent. of spruce fibre is required in order to get commercial fibre pulp for the manufacture of paper, and suppose either a natural person, or a corporation, or a combination of corporations, with a purpose to wholly overturn the general economic conditions in the

wood-pulp and paper industry, should buy the entire spruce product of the country, which, of course, is a thing quite possible, and, of course, something which might be legally done, and suppose it should be held with notice that it would be neither used nor sold, the avowed purpose being to force upon the public and into the newspaper business an artificial patent product which would bring greater profits in return. If such a condition is dominant and absolute, and may have the aid of equity as a controlling force, the owner of the legal title may not only withhold the natural spruce product, but he may, if he so wills, hold in nonuse the patent product, his attitude thus operating to withdraw newspapers, magazines, and wrapping paper from the public, or, in the event of use of his patent product under his absolute right, he may dominate the additional expense which the public shall pay for the patent product which his control has forced into the newspaper, magazine, and wrapping paper industries. Such a perverse, oppressive, and revolutionary exercise of a naked and abstract legal right might not operate to forfeit the right to hold the legal title, but upon equitable principles it would operate to forfeit the right to have equitable relief or equitable aid by way of injunction. The person so holding and exercising the legal right might perhaps recover damages in an action at law from individuals who invade the legal right. The damages, however, would probably have reference to the value of the spruce rather than to the loss of profits in respect to the product wrongfully intended to be forced upon the public.

The suggestion of Judge Lurton in the Heaton Case, that security to the public resides in the supposition that business instincts and business interests will induce the patentee to use the most beneficial right, is no sufficient answer to such an idea of absolutism. That school of legal and equitable philosophy would still leave the holder of the cumulated patents in nonuse in the domain of control, because he alone may absolutely will which product is most beneficial, and which the public and business shall have, and upon what terms, and this would be at the expense of intended competitive conditions in trade.

It is for such reasons and upon such considerations that equity should at least leave parties to stand upon their legal rights without the aid of injunction, when it is their purpose to acquire legal titles for control in the direction of forcing conditions which offend the spirit of the law, public policy, and the conscience of equity.

Again, to illustrate that equity does not always follow the legal right, a member of the public has a legal right to use a public highway, but a court of equity would not enter the field for the purpose of aiding him in such an exercise of the right as amounts to a public nuisance, or in such an exercise of the legal right of travel as to wholly reverse the policy of the law in respect to the general public, whose rights have reference to the purpose of the law which instituted the highway situation and to which the relative rights relate.

An injunction in aid of a legal right does not follow as a strict legal right, nor does it follow as of course. The question whether an injunction should go in a given case relates quite as much to the purpose in respect to the use of the right as the right itself. The

purpose for which the right is to be exercised may be quite decisive of the question whether a court of equity will aid by injunction.

An individual or a corporation who holds a naked, legal, statutory right, and who sustains a wrongful attitude to public policy and to the law upon which the right is founded, has no vested right to have an equitable injunction in his aid, because the attitude is one which offends public policy, and ignores the intention of the statute law upon which the supposed right is founded.

Courts of equity are neither bound by principles of equity nor justice in the exercise of discretion to help a situation in purpose wrongful. They may safely leave such a situation to be solved upon lines of legal right. Every right created by law and every natural right may be so inequitably used as to forfeit the claim upon equity to have the right aided by injunction. It is an ancient and familiar principle of equity that one who asks the aid of equity should accord equity. That principle is quite decisive of the question here. Under such a principle, injunction should not aid a situation which involves inequity, and especially where the situation involves an inequity which results from a purpose and use which contravene the spirit of the Constitution—a purpose and use which offend public policy and overthrow the intention of the statute law upon which the supposed right is founded, and in respect of which the equitable injunction relief is sought. Under such circumstances the discretionary right to ask for equitable injunction aid is forfeited upon the ground that equity will not aid the wrongful or oppressive exercise of the legal right, but will leave it where equity finds it.

A court of equity by means of injunction should no more aid an individual or a corporation in a purpose to control industries through a monopoly of patent rights held in intentional and deliberate nonuse than it should aid a person or a corporation in a purpose through strictly legal titles or government grants, not involving invention, to control and monopolize the coal industry, or any other industry, where the purpose is to control a situation which affects the rights and interests of the general public.

Many jurists hold the view that the Sherman act, conferring upon the federal courts jurisdiction over matters of trust, etc., and the subsequent acts extending and emphasizing its provisions, are merely declaratory of efficient and potential principles of common law and doctrines of equity governing courts of general jurisdiction.

Without regard, however, to the question whether this is strictly so or not, and without regard to the question whether an aggregation of patent rights for the purpose of locking them up and denying to the public the constitutionally and statutorily intended benefits of invention, all to the end that a single invention or discovery shall be forced upon the public by withholding all others, is something within the recent provisions of the acts of Congress intended to protect the public against monopoly, it, at least, is something which presents a situation as lacking in equity, so far as injunction is concerned, as are situations where unfair and inequitable control is secured through aggregations prohibited by the acts of Congress to which reference has been made.

To restate the position: The statute protects the right to make, use, and vend. There was never any idea of equitable injunction protection of patent rights in the hands of individuals or corporations in the stifled condition of nonuse, with a purpose and a result which retard business prosperity and benefits, which, under natural competitive conditions, would come to trade and industry, a purpose and a result at once harmful to the general public interests, and without denying the individual or corporate abstract right to acquire and hold the legal title to any number of patents, once admitting that equitable protection should be given to a single competing patent purposely acquired and held in deliberate nonuse to stifle patent competition, the legal and equitable logic, involved in the proposition, carries injunction protection to a complete monopoly of all useful invention and discoveries held in nonuse, if so willed by the owner, a condition of things, in an equitable sense, at once intolerable.

Under a contract which gives patentees a monopoly of the thing invented, but more properly under a public statute, into which the public interests enter, which protects in the exclusive right to make, use, and vend, a court of equity is asked to help suppress all invention, which upon merit fairly enters into competition with the statutory monopoly which they hold. Such would be a monopoly beyond the statutorily intended monopoly, and one which would offend the laws of business and every principle of natural justice, and the proposition of equitable aid through injunction is indefensible.

Reasonable considerations of wise public policy, and of principles governing equitable jurisprudence, require that equitable aid, through the discretionary arm of injunction, should be withheld from one who attempts to unreasonably and inequitably oppress the general public, and to so use a naked legal right, which inheres in a situation involving a government purpose, and into which the public right in a sense enters, as to offend and wholly reverse the plain spirit and policy of the fundamental law upon which the right is founded.

Justification of noninjunction intervention under such circumstances invokes no novel doctrine. Noninterference under such conditions is based upon fundamental and substantial grounds of justice and equity. Artificial statutory rights, existing in deliberate nonuse for purposes of control and to dominate business, with the legal right aided by equitable injunction, would at once become a thing altogether intolerable and indefensible.

If this is not a case of merit for injunction, equitable jurisdiction will not be held for purposes of an accounting. Such relief in patent cases is ordinarily incidental to some other equity. Root v. Railway Company, 105 U. S. 189, 26 L. Ed. 975; Germain v. Wilgus, 67 Fed. 597, 600, 14 C. C. A. 561, 564.