MINNEAPOLIS, ST. P. & S. S. M. RY. CO. et al. v. BARNETT & RECORD CO.

(Circuit Court of Appeals, Eighth Circuit. March 22, 1919. Rehearing Denied June 28, 1919.)

No. 5101.

1. PATENTS ⟂26(1)—INVENTION—NEW COMBINATION OF OLD ELEMENTS.
A new combination of old elements whereby an old result is obtained in a more facile, economical, and efficient way is as securely protected by a patent as is a new machine or composition of matter, provided the discovery and reduction to practice of the novel combination rose above the reach of the skill of the mechanic trained in the art.

2. PATENTS ⟂243—PATENTS FOR COMBINATIONS.
When the advance toward the desideratum is gradual, and several inventors formed different combinations, which accomplished the result

sought with varying degrees of success, each is entitled to his own combination, as long as it differs from those of his competitors and does not include theirs.

**3. PATENTS ☞66—ANTICIPATION—PATENTS FOR COMBINATION.**

That prior patents separately disclosed one or more of the elements of a later patent, while no one of them disclosed them all, does not necessarily establish anticipation by any of them.

**4. PATENTS ☞324(5)—DECISIONS SUSTAINING VALIDITY—REVIEW ON APPEAL.**

Where a patent has been granted and sustained by a trial court, the legal presumption is that the decisions of the Patent Office and the court in an infringement case, were right, and they may not lawfully be reversed by an appellate court, unless there is clear and convincing proof in the record that they have made some serious mistake of fact or fallen into fatal error of law.

**5. PATENTS ☞53—ANTICIPATION—UNCOMPLETED INVENTION.**

The mere conception of an invention and the drawing of plans and sketches thereof does not constitute one an inventor for the purpose of anticipating a later patent to another.

**6. PATENTS ☞174, 177—SCOPE—USES UNKNOWN TO PATENTEE.**

When a patentee has plainly described and claimed his improvements or combinations, he has the right to every use to which they can be applied, and to every way in which they can be utilized, whether or not he was aware of them when he secured his patent.

**7. PATENTS ☞157(2)—CONSTRUCTION TO GIVE VALIDITY AND EFFECT.**

It is one of the fundamental rules for the interpretation of contracts and grants, especially applicable to grants of patents, that in case of doubt or ambiguity that construction should be preferred which sustains and vitalizes, rather than that which strikes down and paralyzes.

**8. PATENTS ☞328—VALIDITY AND INFRINGEMENT—GRAIN ELEVATOR.**

The McQueen patent, No. 896,233, for a working elevator, *held* not anticipated, valid, and infringed.

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Suit in equity by the Barnett & Record Company against the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and the Tri-State Land Company. Decree for complainant, and defendants appeal. Affirmed.

Frank Parker Davis and Edward Rector, both of Chicago, Ill. (Thomas F. Wallace, of Minneapolis, Minn., on the brief), for appellants.

Amasa C. Paul, of Minneapolis, Minn., for appellee.

Before SANBORN, Circuit Judge, and TRIEBER, District Judge.

SANBORN, Circuit Judge. This appeal questions the decree of the District Court that Finlay R. McQueen was the original inventor of the combinations and improvements illustrated by letters patent No. 896,233, issued to him on August 18, 1908, on his application filed June 20, 1907, and particularly pointed out in the first and second claims thereof, that the plaintiff below, the Barnett & Record Company, a corporation, is the owner thereof and of all claims for the past use thereof, that the first and second claims of the patent are valid, that the defendants have infringed those claims, and that the plain-

tiff recover the profits the defendants have obtained and the damages the plaintiff has sustained by reason of the infringement.

In this court counsel for the defendants contend that the decree should be reversed, because the evidence establishes the facts that the patent of the combinations of claims 1 and 2 is invalid, that McQueen was not the first inventor thereof, and that the conception and reduction to practice of the combinations there claimed did not constitute invention. They concede, however, that if neither of these positions is tenable the defendants were guilty of infringement.

The combinations described and secured by the patent relate to improvements in working grain elevators as distinguished from storage elevators. They relate to that type of grain elevator in which the grain may be cleaned, graded, weighed, otherwise worked, and distributed as in working elevators, as well as received, stored, and shipped, as in storage and terminal elevators. At the time McQueen conceived his combinations, an approved type of such an elevator consisted of a workhouse, of circular grain bins, supported by walls or girders and columns above the workhouse, and of a cupola or tower of four or five stories above the bins, wherein the machinery for elevating, spouting, garnering, weighing, and cleaning the grain could be located and operated. Prior to 1905, when McQueen conceived his combinations, such working elevators had been generally constructed of wood or metal, although the basement or the structure beneath the bin floors had often been made of masonry or reinforced concrete. The reason why the bins in such elevators had not usually been constructed of masonry or reinforced concrete seems to have been that the weight of the latter was so great, that the expense of supporting them over the workhouse upon columns and girders or walls was so great, and the necessary columns or walls occupied so much space in the workhouse, that iron or steel, or even wood, bins had been thought preferable to masonry or concrete bins. The danger of fire, however, and the great amount of wood requisite to resist the pressure of the grain, gradually diminished the use of wood, and there were serious objections to metal as material for such bins. Unless the walls of metal bins were made very thick and heavy, or unless they were very strongly and heavily braced and tied with metal rods, they were liable to buckle, crack, or tear open, when one of two or more adjacent bins was emptied of its contents, while the others were filled, on account of the pressure of the grain upon the vacant bin.

During the years between 1895 and 1905, the use of metal reinforced concrete had rapidly increased, and its advantages as a building material had become more and more evident, until builders of working elevators became anxious to construct grain bins for working elevators of reinforced concrete or masonry, but in the then state of the art very heavy and expensive walls, or heavy and expensive girders resting upon many columns, were indispensable to sustain bins of such material over a working house, and such walls, or columns and girders, were so expensive and so cumbered, and occupied so much space in the working house, that they practically prohibited the use of concrete or masonry bins in elevators of this type. In order to

make the use of such bins in such a working elevator practically and commercially possible, it was necessary to find, and demonstrate by reduction to practice, a way to construct, sustain, and operate masonry or metal reinforced bins over a working house without the prohibitive expense of the heavy walls or girders and the numerous columns occupying so much space, which in the then state of the art, were necessary to hold up such bins.

Up to the time that McQueen discovered the combinations of his patents, no one had succeeded in accomplishing this in the United States. McQueen discovered combinations of old elements that accomplished the desideratum, and embodied them in an actual, practical, monolithic structure by means of which the cost of such practical working elevators was reduced about from 12 per cent. to 25 per cent. Working elevators with concrete metal reinforced bins constructed in accordance with the claims and specification of his patent speedily came into common use, and achieved abundant commercial success, so that, when the defendant came to construct the infringing elevator, it selected and built its elevator on the principle of McQueen's combinations, which it embodied therein.

McQueen, in his patent, limited the material in which the bins of his combinations should be embodied to masonry or metal reinforced concrete, preferring the latter. Speaking, then, of concrete, although what is hereafter said is equally applicable to masonry, the principle of McQueen's combinations, and of the working elevator in which he embodied them, is the hanging or suspension above the working house of numerous cylindrical metal reinforced concrete grain bins, placed close together in parallel rows in two directions, so that each bin shall be supported at two diametrically opposite points only, and only by columns, made of the same material as the bins, founded on the heavy concrete basement floor of the working house, rising vertically through the working house and the bin floor, made of the same material, and extending, on diametrically opposite sides of each bin, between the tangentially abutting sides of it and the adjacent bins, unified and made into one monolithic structure with the adjoining bins respectively, between which each column extends from the top to the bottom thereof, by metal reinforced vertically extended connecting bodies of the same material, which include and become one with these columns and the adjoining bins respectively, and extend from top to bottom of the bins, each of which bins is also united at its two other tangentially abutting portions, along which no column rises, by like metal reinforced vertically extended bodies made in one with the two bins between which they respectively extend from top to bottom, so that the columns, the bins, the vertically extending bodies of metal reinforced concrete between the tangentially abutting portions of the bins, are all rigidly united and made into one homogeneous monolithic structure, hung upon and sustained above the working house, so that the bins are suspended only at two diametrically opposite points by the columns which have been described, and by those columns only which sustain the entire monolithic structure and the cupola above the bins, which was preferably made of metal and sup-

257 F.—20

ported on columns, the foot of each of which was founded on the top of one of the extended vertical metal reinforced columns, which extended to the top of the bins and of the monolithic structure. McQueen also described in his specifications and claims the combination which has been described, with transverse tie walls extending from the top to the bottom of the monolithic structure, whereby portions of the spaces between the bins on opposite sides of the tangentially connected portions of the bins were cut off, and closed spaces were thereby provided between the bins for elevator legs through the monolithic structure from the cupola to the working house.

McQueen's two claims here in suit read in this way:

"1. The combination with a multiplicity of masonry bins having their axes arranged in rows in two directions and having their tangentially engaged sides rigidly united by masonry body portions, certain of which constitute column extensions, and supporting columns below said bins vertically aligned and united with said tangential column extension portions of said bins and serving to support the said bins only at two diametrically opposite points, substantially as described.

"2. The combination with a multiplicity of bins having their axes arranged in rows in two directions and on lines that intersect each other approximately at a right angle and having tangentially engaging sides united by vertically extended masonry body portions, certain of which constitute column extensions, supporting columns below said bins, vertically aligned and united with said tangential column extension portions of said bins and supporting said bins at two diametrically opposite points only, and certain of which bins are further connected by transverse tie walls that extend from top to bottom of said bins and form, on opposite sides of the tangentially connected portions of the bins, spaces through which elevator legs may be passed, substantially as described."

[1] This is a patent for a combination of old mechanical elements. It is not for the columns, or bins, or working house, or the masonry, or the metal reinforced concrete. It is for the novel combination of the various elements described and claimed, whereby the whole result is obtained in a more economical and useful way. A new combination of old elements, whereby an old result is obtained in a more facile, economical, and efficient way, is as securely protected by a patent as is a new machine or composition of matter, provided that the discovery and reduction to practice of the novel combination rose above the reach of the skill of the mechanic trained in the art. Seymour v. Osborne, 11 Wall. 516, 542, 548, 20 L. Ed. 33; Gould v. Rees, 15 Wall. 187, 21 L. Ed. 39; Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 215 Fed. 362, 369, 131 C. C. A. 504.

[2] Counsel have spread upon the record an exhaustive display of the history of the art of constructing grain elevators, and of its state at the time when McQueen conceived and reduced to useful and commercial practice his patented combinations. This portrayal clearly discloses the fact that the advance toward the fortunate and successful working elevator which he conceived and constructed was gradual, and that in the progress of that advance mechanics and inventors at different times found different combinations whereby they approached the result of constructing useful working elevators with varying degrees of success. This history of the art brings this case under the familiar rule that when the advance toward the desideratum is

gradual, and several inventors formed different combinations, which accomplished the result sought with varying degrees of success, each is entitled to his own combination, as long as it differs from those of his competitors and does not include theirs. Railway Co. v. Sayles, 97 U. S. 554, 556, 24 L. Ed. 1053; McCormick v. Talcott, 20 How. 402, 405, 15 L. Ed. 930.

[3] Patents, publications, and actual structures have been proved, some of which disclosed one, and others more, of the old elements of McQueen's combinations; but the fact that one of these disclosed one and another another or more elements of the patented combination, while none of them discloses all of the elements thereof, does not necessarily establish the fact that any of them anticipates the combinations of the plaintiff. Imhaeuser v. Buerk, 101 U. S. 647, 660, 25 L. Ed. 945; Bates v. Coe, 98 U. S. 31, 48, 25 L. Ed. 68; Owens Co. v. Twin City Separator Co., 168 Fed. 259, 265, 93 C. C. A. 561.

[4] The two claims of the patent here in suit have been sustained by the expert examiners of the Patent Office and by the learned judge below who tried this case. The legal presumption is that the decisions of these officers were right. Their decrees may not lawfully be reversed, unless there is clear and convincing proof in the record before us that they have made some serious mistake of fact, or have fallen into a fatal error of law in the determination of the questions before them.

No good purpose would be served by attempting to embody the history of this art, or to portray its state in 1905, when McQueen conceived his alleged invention, in this opinion. It will be sufficient to notice the prior patents, publications, and structures, which appear from the testimony to be those most closely resembling the devices of McQueen. Mr. Browne, the main witness and the expert for the defendants, testified that in his opinion patent No. 37,134, to George H. Johnson, issued December 9, 1862, came nearer than any others to showing the complete combination of claim No. 1 of McQueen's patent, but that he had found no prior patent, publication, or structure, which disclosed the entire combination of either the first or second claim thereof. This patent to Johnson clearly demonstrates the fact that he was trying by the improvements he describes therein as early as 1862 to find some way to remedy the defects of cylindrical iron grain bins. He writes in his specifications that previous to his invention storehouses for grain had been constructed of cylindrical iron bins, arranged vertically and in contact with each other, and that the spaces between the bins had been employed as supplemental bins, but that when the grain was drawn off from one of these iron grain bins the sides were apt to collapse, not being of sufficient strength to resist the pressure of the grain in the filled bins adjacent to them. To remedy this evil he described and claimed small cylindrical iron bins placed in the spaces between the larger bins, and wrote that, while that feature was applicable to iron cylindrical bins, he had shown it with other features, which he claimed as applied to a new construction of bins and cylinders formed of brickwork tied together by means of plates and rods of iron. He then described cylindrical

bins of brickwork, tied together by horizontal bond plates and vertical tie rods, "sustained on a suitable floor, by arches $D$ and columns $E$ of masonry, brickwork, or iron, as deemed expedient." But this structure of Johnson (1) did not constitute a working elevator, but a mere storehouse; (2) was not suspended or supported over a workhouse, leaving a broad open space for working the grain beneath the bin floor, but was sustained on arches and columns beneath the bin floor, occupying much of the space there; (3) was not sustained by columns founded on the concrete floor of the basement of a workhouse extended vertically through the bin floor and between the tangentially abutting portions of masonry or concrete bins to their tops, so that the bins were supported thereon only at two diametrically opposite points; (4) did not consist of a rigid union and a consolidation in one monolith of such vertical columns, bin floors, bins, body portions made of masonry or of metal reinforced concrete between the tangentially abutting portions of the bins, and hence it failed to disclose the principle or mode of operation of McQueen's combinations, or the means which attained the desired result, nor did it anticipate the combinations of either of the claims in this suit.

Among other alleged anticipations or in the evidence to sustain lack of invention to which counsel for the defendants refer are:

Patent No. 24,424, to Badger and Sampson, of June 14, 1859, for the substitution of brick, stone, or iron square or tubular grain bins for wooden bins, which discloses such bins standing on a platform supported by two sets of arches beneath them, sustained on columns beneath the arches. But this disclosure lacks (1) the exclusive location of the supporting columns vertically under the tangentially abutting portions of the bins; (2) the continuous columns extending from basement floor of workinghouse through the bin floor between the tangentially abutting portions of the bins to their tops; (3) the body portions extending vertically between the tangentially abutting portions of the bins through their entire length rigidly uniting in one monolithic whole the bins and the columns between the bins; (4) the hanging or suspension of the bins and the entire monolithic structure on the continuous columns made in one therewith only at two diametrically opposite points of the bins, and other less material elements of McQueen's combinations, while it portrays the double arches and the unnecessary columns under the bin floor which it was one of the objects of McQueen's improvement to dispense with.

Patent No. 777,730, to Jamieson, issued December 20, 1904, for a complex, confused, and complicated method of binding together concrete and metal in a grain bin structure consisting of columns and bins which lacks (1) the cylindrical bins; (2) the working house beneath the bins; (3) the suspension of the bins above the working house by continuous columns only at two diametrically opposite points of the bins; (4) the tie walls and the spaces for the elevator legs of McQueen's combinations.

Patent No. 662,452, of November 27, 1900, to James Macdonald, for combinations of cylindrical sheet metal grain bins in the form of nested bins in a storage warehouse which lacks (1) the work-

house; (2) the suspension of the bins above the workhouse; (3) the continuous columns from the basement of the workhouse to the top of the bins; and (4) the support of the bins only at two diametrically opposite points by continuous vertical columns founded on the heavy cement basement of the workhouse and extending up through the workhouse between the tangentially abutting portions of the bins to their tops rigidly united and made in one with them, and many other less material elements of McQueen's combinations.

All these and all the other less material patents presented by the record, have been carefully examined, but none has been found which comes nearer to disclosing the combinations of McQueen, or to an anticipation thereof, than the patent to Johnson which was first discussed, and this court is not persuaded that the Johnson patent, or that any of the patents disclosed in this record, fairly anticipated the combinations of the claims 1 or 2 of the patent to McQueen.

Counsel has cited as an anticipation of these claims the copyrighted book of the Architectural Iron Works of the year 1865 at pages 7, 60, 61, 62, which portrays the Brooklyn Iron Elevator. This iron elevator was a storage and transfer elevator constructed to store and transfer grain from cars to ships. It was built about 1865, and torn down about 1902. It was provided with cylindrical iron bins "made like boilers of riveted plate iron" arranged in rows at right angles, supported on a flat floor, which rested on iron girders, sustained by iron columns beneath the girders. It contained somewhere between 60 and 90 bins. The testimony is conflicting on the question whether the columns were located vertically beneath the tangentially abutting portions of the bins, or vertically beneath the centers of the bins. The evidence for the former location consists principally of the description in the book of the Architectural Iron Works and the testimony of witnesses who saw the elevator before it was torn down, or the site of it after its removal. The evidence for the latter location consists of the blueprints of the drawings, made by George H. Johnson, the engineer for the construction of the elevator, which were found after his death among his papers, and which showed the columns vertically under the centers of the bins, and the testimony of witnesses to the discovery of these plans and the preservation of them. There was also testimony upon each side of this question of witnesses relative to the interpretation or meaning of the disclosures in the book of the Architectural Iron Works and the plans and sketches which were introduced in evidence. All this evidence has been carefully and repeatedly examined. But in the light of the fact that the witnesses who saw the elevator testified more than 12 years thereafter, of their uncertainty as to the details of the construction, and of the unreliability of the memory of men after so many years, and of the established rule of law that the burden was upon the defendants to prove the location of these columns by clear, convincing, and satisfactory evidence, the proof in this record has failed to convince that the columns of the Brooklyn Iron Elevator were located vertically under the tangentially abutting portions of the bins, or that it embodied either the principle or the combinations of the first or second claims of the pat-

ent to McQueen. It lacks these material elements or attributes of Mc-Queen's combinations: (1) The continuous columns of metal reinforced concrete or masonry extending from the basement floor of a working house beneath the bins up through the workhouse, the bin floor, and between the tangentially abutting portions of the bins to their tops; (2) the rigid union of the tangentially abutting portions of the bins, the columns between them and the body portions of the concrete extending from the top to bottom of the bins; (3) the construction out of metal reinforced concrete or masonry in one homogeneous monolithic whole of the continuous columns, the bins, the body portions between them, and the floor beneath them; and (4) the suspension and support of this monolithic structure by the columns only at two diametrically opposite parts of the bins; and the conclusion is that the Brooklyn Elevator failed to anticipate the patented combinations here in issue.

About the year 1901 at Buffalo, N. Y., an elevator was built, called the Dakota, wherein iron or steel cylindrical bins were supported by four continuous iron or steel columns to each bin, extending vertically between the abutting portions of the bins. It is persuasively argued that this elevator anticipates the combinations of McQueen, and demonstrates the fact that there was no invention in conceiving and reducing them to practice, because it required no exercise of the inventive faculty to merely substitute masonry or reinforced concrete for iron or steel in this elevator, or to reduce the necessary number of supporting columns 50 per cent. Conceding that there is ordinarily no invention in the mere substitution in the construction of a building or elevator of one equivalent building material for another, it is too broad a statement to declare that there may never be invention in the substitution of one building material for another, and that is well illustrated by the story of this art. Johnson in his patent in 1862 suggested and described cylindrical bins of masonry supported on a floor resting on masonry, brickwork, or iron. It was not, however, until some 40 years after that, that metal reinforced concrete came even into limited use for cylindrical elevator bins, and then these bins were not suspended above a workhouse by continuous columns made in one with them and with other parts of the structure, as in McQueen's combination, but they were based on heavy masonry walls, or on heavy girders and columns of metal beneath them. The uses and capabilities of reinforced concrete, well known in this year 1919, were so far unknown in 1862 that there can be no doubt that it would then have been a novel and useful invention to have conceived and reduced to practice an elevator building, according to the plan of McQueen. Johnson's patent does not appear to have brought within the reach of the skill of the mechanic a practical and useful working elevator made of metal reinforced concrete, or of masonry based on and supported by heavy walls and columns, until about 40 years after the date of his patent, and neither Johnson's nor any of the other patents or structures disclosed in this case, nor all together, appear to have enabled any one to conceive and reduce to practice or commercial use in this country such a metal reinforced solid monolithic

structure of either concrete or masonry suspended above a workhouse only at two diametrically opposite points of cylindrical bins by continuous columns between them, extending from basement of workhouse to the top of the columns wherein the bins, the columns, and the body portions between them are all consolidated together in one homogeneous whole, until McQueen conceived and made the combinations secured by this patent. The desirability of sustaining concrete or masonry bins on columns above workhouses had long been known. Iron elevators had been so sustained, but the skill of the mechanic had demonstrated no way of so sustaining the great weight of metal reinforced concrete or masonry bins without prohibitive cost. McQueen conceived and provided combinations whereby such bins could be and have since been suspended on columns over workhouses at a cost of from 10 to 25 per cent. less than the cost of metal elevators of like capacity. If the Dakota Elevaor had been built in accordance with McQueen's patent, about one-half of the columns could have been dispensed with, the usable space beneath them for cleaning and working grain could have been greatly increased and from 10 to 25 per cent. of its cost could have been saved. The examiners of the Patent Office and the judge below were of the opinion that, to one who had conceived and reduced to practice and commercial use combinations which evidenced so striking an advance in the art of constructing working elevators, the title of inventor ought not to be denied, and this court is convinced that there was no error of law or mistake of fact in that conclusion.

This result has not been reached without a thoughtful consideration of the testimony of witnesses and of the other structures, publications, plans, and sketches which this record contains. Mr. Browne, the expert and main witness for the defendants, testified that in his opinion the Brooklyn Iron Elevator more nearly resembled the structure of McQueen's combinations than any other structure disclosed by the evidence, and Mr. Carter, the expert for the plaintiff, testified that in his opinion the Dakota Elevator enjoyed this distinction. As neither of them anticipates the patented combination of McQueen in suit, and no structure more nearly resembling McQueen's elevator has been discovered by the court from the evidence in this case, it is unnecessary to discuss the other disclosures at length.

[5] There was an elevator built in 1903 or 1904 in the Montreal Harbor, known in the evidence as the Montreal Harbor Elevator, under the supervision of Mr. Harry R. Wait, who testified that he conceived and made the sketches or plans therefor in 1902. The plan was to make the bins of that elevator of steel, and to support them by columns of steel or iron combined with a filling of concrete, and to have them extend between the tangentially abutting portions of the cylindrical bins to the tops thereof. There was a conflict and controversy in the evidence over the question whether or not Mr. Wait conceived his alleged invention and made his plans for this elevator in the United States or in Canada; but, even if the concession were made that he conceived the plan and made the sketches, drawings, and plans for it in this country in 1902, it is certain that he did not re-

duce it to practice in this country, nor was it patented or described in any printed publication, within the meaning of section 2943 of the Revised Statutes, before McQueen, in the belief that he was the original and first inventor of the thing patented to him, filed his application for his patent. Now Wait's reduction to practice of his alleged invention by the construction of monolithic homogeneous elevators in Canada was therefore a nullity, so far as diligence in reduction to practice is concerned, and the only material steps he took before McQueen filed his application were the mere conception of an alleged invention and the drawing of plans therefor. But the mere conception and drawing of plans or sketches thereof is insufficient to prove one an inventor. And the result is that the Montreal Harbor Elevator does not constitute an anticipation of McQueen's patented combinations, and, moreover, the evidence in this case falls far short of that clear, convincing, and satisfactory proof required to warrant a finding by this court that Wait was the first inventor of the combinations of McQueen in view of the latter's patent therefor. Sections 4886 and 4923, Rev. St. (8 U. S. Comp. St. 1916, §§ 9430 and 9469); Detroit Lubricator Mfg. Co. v. Renchard, 9 Fed. 293, 296; Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, 166 Fed. 288, 298, 92 C. C. A. 206; Westinghouse Machine Co. v. General Electric Co., 207 Fed. 75, 77, 126 C. C. A. 575.

Before reaching this conclusion the opinion of Judge Cassels in 13 Exchequer Court Reports, Canada, 186, was carefully considered. It does not, however, rule the material issues in this case, because his question was the validity of McQueen's Canadian patent, the Montreal Harbor Elevator was available in his case as evidence of anticipation of that patent, and the sections of the Revised Statutes of the United States which make that structure unavailable as such evidence in the case in hand did not govern there and were irrelevant to the issues in his case.

[6] It was suggested in the course of the argument that the specifications and drawings of the patent to McQueen disclosed girders under a floor beneath the bins, and thereby indicated that when he made his invention, and when he described and claimed it, he did not know or conceive that the continuous columns of his combinations would and did support the bins and floor below them, without or notwithstanding the girders. It is not probable that he was thus ignorant or thoughtless, because in the first and second claims of his patent he does not include the girders or the floor, and he certainly would have done so, if he had thought them indispensable to his patented combinations. Moreover, even if this want of perception of the benefits of his invention existed, it would not be fatal to his patent, for, when one has plainly described and claimed his improvements or combinations, and secured a patent for them, he has the right to every use to which they can be applied, and to every way in which they can be utilized to perform their function, whether or not he was aware of all these uses and methods of use when he claimed and secured his monopoly. Roberts v. Ryer, 91 U. S. 150, 157, 23 L. Ed. 267; Miller v. Eagle Mfg. Co., 151 U. S. 201, 14 Sup. Ct. 310, 38 L. Ed. 121;

National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 709, 45 C. C. A. 544.

The evidence and arguments of counsel for the defendants to the effect that the combinations of the second claim, which consists of the combination of the first claim with the transverse tie walls that extend from top to bottom of certain of the bins, and form on opposite sides of the tangentially connected portions of the bins vertical spaces through which elevator legs may be passed from the cupola through the concrete or masonry structure to the working house below, one on one side and the other on the other side of the tangentially connected portions of the bins, was anticipated by the Dakota Elevator, the Great Northern Elevator, the Rialto Elevator, and other structures, and by the patents to Johnson, to Macdonald, and to others, and was not patentable, have not been overlooked. But, as neither of these structures or patents contain the combination of the first claim of McQueen, it does not contain the combination of the elements of that claim and the additional elements of the tie walls and spaces for the elevator legs described in the second claim. The question is not whether or not the tie walls and the spaces for the elevator legs were anticipated or patentable considered by themselves, but whether or not the combination of them with the combination of the elements of the first claim was patentable, and the court is not persuaded that it was not.

[7] It is not unwise at times to recur to the nature, object, and effect of a patent. to call to mind the facts that it arises out of an offer of the United States to warrant to an inventor, in consideration of his making, reducing to practice, and giving to the public a new and valuable invention forever after, the exclusive right to use and vend it for a few years, that this offer must be followed by an acceptance by the inventor, not by words, but by the actual making, publishing, and reducing to beneficial use of such an invention and by proof thereof to the satisfaction of the United States before the patent can issue; that the patent, when issued, is the written evidence that such proof has been made to the satisfaction of the United States, and also of a contract of the United States to the effect that during the term of the patent it will secure to the patentee the exclusive right to vend and use the machine, device, or combination described and claimed in his patent. It is one of the fundamental rules for the interpretation of contracts and grants that, in case of doubt or ambiguity, that construction should be preferred which sustains and vitalizes, rather than that which strikes down and paralyzes. Reece Button-Hole Machine Co. v. Globe Button-Hole Machine Co., 61 Fed. 958, 962, 10 C. C. A. 194; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 712, 45 C. C. A. 544.

[8] It is also well to remember that such a patent or contract, and the enforcement of it, take nothing from those who are not parties to it. They have the same right and freedom to use all the devices and improvements that were known and available to them before the invention or discovery was made and patented, that they had before the patent was issued. For example, if the defendants think that any

of the devices or improvements or combinations disclosed in any of the numerous patents, publications, or structures they have introduced in evidence as anticipating the combinations patented to McQueen are equivalent or preferable to his, they may still use those, notwithstanding his patent, so that the enforcement of McQueen's patent contract cannot injure them, while the failure to enforce it deprives him of a part at least of the benefits warranted to him by the patent. The conclusion of the whole matter is that in the gradual advance of the art, to which reference has been made, the patentee McQueen was the first and original inventor of the novel and useful combinations described in his patent and claimed in the first and second claims thereof, that the defendant infringed these claims, and that the decree below must be affirmed.

It is so ordered.