SCHAUM & UHLINGER, Inc., v. COPLEY-PLAZA OPERATING CO.

(District Court, D. Massachusetts. August 8, 1919.)

No. 802.

1. PATENTS ⬡═══232—INFRINGEMENT—PROCESS.

Where defendant bought a polishing machine which as changed at the suggestion of a salesman, formerly in the employ of complainant's predecessor, adapted the machine for polishing in accordance with the process of complainant's patent, defendant is, if the patent be valid, an infringer.

2. PATENTS ⬡═══328—VALIDITY—POLISHING PROCESS.

The Uebersax patent, No. 1,063,478, for a process for polishing utensils, particularly culinary silverware, held valid, showing invention, and not being anticipated.

3. PATENTS ⬡═══99—VALIDITY—SPECIFICATIONS—SUFFICIENCY.

An inventor is not required to specify how his process can be most economically used; it is enough that he describe it so that one skilled in the art could use it; hence a patent for a process for polishing culinary utensils, particularly silver, is not invalid because one skilled in the art might, after reading the specifications, need some experiment to determine the method requisite for the successful operation of the process.

4. PATENTS ⬡═══328—SPECIFICATION—SUFFICIENCY.

The Uebersax patent, No. 1,063,478, for a process for polishing utensils, particularly culinary silverware, which in its original specification provided for the polishing by means of a soapy solution and steel balls, which were revolved in a drum, held to sufficiently disclose the process, within Rev. St. § 4888 (Comp. St. § 9432), as to be valid regardless of amendments.

5. PATENTS ⬡═══109—AMENDMENTS—VERIFICATION.

Where the original specification in a patent sufficiently described the process, it is immaterial that an amended specification was not verified as required by Patent Office rule 48.

In Equity. Suit by Schaum & Uhlinger, Incorporated, against the Copley-Plaza Operating Company. Decree for complainant.

Van Everen, Fish & Hildreth, of Boston, Mass. (Alfred W. Kiddle and Henry T. Hornidge, both of New York City, and Alfred H. Hildreth, of Boston, Mass., of counsel), for plaintiff.

Oliver Mitchell, of Boston, Mass., and Edwin F. Thayer, of Attleboro, Mass., for defendant.

ANDERSON, Circuit Judge. This is an infringement suit brought by the owner of patent No. 1,063,478, dated June 3, 1913, against the Copley-Plaza Operating Company. The title of the patent is "Process for Polishing Utensils." Jean Uebersax, of Switzerland, was the inventor and original applicant. The application was dated April 7, 1911.

The defendant is using in its hotel a polishing machine furnished it by the Smith-Richardson Company of Attleboro, Mass., which is assisting the Copley-Plaza Company in the defense of this suit. The usual defenses are set up in the answer, including noninfringement; but the main reliance of the defense is the alleged invalidity of the patent.

[1] The defense of noninfringement may conveniently and briefly be disposed of as a preliminary matter. The defendant's machine was

sold it by one Young, who now has the exclusive selling agency of the Smith-Richardson machines for the hotel and restaurant trade. From January to October, 1915, Young was employed to sell machines adapted specially to the plaintiff's process, then called the Tahara machine. After his discharge by the Tahara Company, the plaintiff's predecessor in title, and his employment by the Smith-Richardson Company, certain changes were, at his suggestion, made in their machines so as to adapt them commercially for polishing in accordance with the plaintiff's process. It is clear, and I find, that Young became familiar with this process while with the Tahara Company, and later undertook to exploit it for the benefit of his new employer and himself as exclusive agent in the hotel and restaurant trade. The defendant is, as the evidence plainly shows, using a process indistinguishable in any material or legal aspect. If the patent is valid, the plaintiff is entitled to hold the defendant as an infringer.

[2] The material parts of the patent are as follows:

"This invention relates to a process for polishing silver utensils, that is to say, for rendering silver plates and other silver utensils for table and culinary purposes brilliant by polishing. This process consists in placing those silver utensils to be polished which are very liable to get out of shape, such, for example, as teapots, plates, coffeepots, sauceboats, etc., with an aqueous soap solution of 2 to 4 per thousand for example, and with small steel balls and small steel pins, in a rotary drum, and in causing the drum, thus charged and closed as hermetically as possible, to revolve for a certain time in order that, under the combined action of the steel balls and pins and the soapy water upon the silver utensils, the latter may become polished, the steel balls and pins being employed in such quantities that they always completely cover the silver utensils during the rotation of the drum, for the purpose of avoiding almost the radial displacement of the said articles and consequently of preventing them from getting out of shape. Consequently the position of each utensil to be polished relatively to the longitudinal axis of the drum is not changed during the rotation of this latter, the steel balls and pins effecting only a restrained and slow displacement along the surfaces of the utensils to be polished."

Then follows a description of a convenient but unpatented polishing device consisting of a rotary prismatic drum or tumbling barrel, with the requisite operating machinery so arranged as to be open at one side over a trough and sieve in order to separate the polishing mass from the articles polished. The patent then continues:

"During the rotation of the drum the silver utensils, which are liable easily to get out of shape, will remain always fully enveloped by the steel balls and pins, and, as these balls and pins are much more mobile than the said utensils, the latter will never become much displaced in the radial direction within the drum during the rotation of the latter, and will consequently not be subjected to deformation.

"The utensils have such relation to the polishing mass in specific gravity as to be kept approximately central of the drum in its rotation, and will neither fall to the bottom nor rise to the top in the rotation of the drum, and hence are kept from contact with the walls of the drum and prevented from being deformed in any way. The speed of rotation varies according to the character of the article; that is, a perfectly round article would still remain central whether the speed be high or low, but an article having projections, such as a water pitcher or the like, would be dislodged from an absolutely central position, due to the irregular action upon the projecting parts; and hence the rotation is adjusted to a comparatively low speed, which will

not materially dislodge any articles which it is desired to clean from the approximately normal central position during rotation, the drum, besides, being capable of being subdivided by transverse partitions removably adapted to its part *b*, and serving to prevent the lateral displacement of the silver articles which are liable easily to get out of shape.

"What I claim is:

"The method herein described of polishing articles, consisting in subjecting the articles to rotation while suspended within a polishing mass, the relative specific gravity of the articles and polishing mass being such as to maintain the articles approximately central of the polishing medium during rotation, substantially as described."

The plaintiff's expert witness, William A. Johnston, Professor of Theoretical and Applied Mechanics at the Massachusetts Institute of Technology, describes this process as follows:

"The process is one for polishing silver utensils; that is to say, for rendering silver plates and other table utensils for table and culinary purposes brilliant by polishing. The process consists of subjecting the articles to be polished to rotation within a polishing medium, and producing this rotation while the article is suspended in the polishing medium."

"This means the article to be polished is actually rotated within the polishing mass, while suspended in that mass; that is to say, under such conditions that it is not substantially displaced radially from approximately the central position during rotation. Or, in other words, the article is rotated while continuously held approximately central of the mass; and excludes a condition where the article passes in and out of the mass; that is, where the article is sometimes within and sometimes without the mass."

The polishing mass suggested by Uebersax consists of steel balls of various sizes, but all small, and steel pins or "oats," with soapy water enough to cover the mass in the tumbling barrel. Prof. Johnston continues his exposition of the process as follows:

"The inventor suggests as a preferred means the use of a polygonal drum which is subjected to rotation by some driving mechanism, the drum in turn subjecting the polishing mass therein to rotation, and the polishing mass in turn subjecting the article within it to rotation. The inventor discovered that it was possible to suspend the article within the polishing mass by applying certain laws of mechanics. Certain elements enter into this problem of suspending the body within the polishing mass as that expression is used in the patent:

"(a) Speed of rotation of the polishing mass relative to the size and shape of the article to be polished;

"(b) The relative specific gravity of the mass and of the article to be polished;

"(c) The relative quantity of the polishing mass to the size and shape of the article to be polished.

"As pointed out by Uebersax, the speed of rotation is relative to the size and shape of the article; the more irregular the article, the more tendency it has to be displaced radially from a central position, and hence the more irregular the article the more necessity for adjusting the speed.

"With reference to the relative specific gravity of the mass and article to be polished, and using specific gravity in its technical sense, the relation between the weight of the article and the weight of an equal volume of water, it is evident that a certain relation between the specific gravity of the article as it is in the mass, and of the mass, must be found present in order to preserve the suspension of the article within an approximately central position. Uebersax points out that this condition is present in the case of the articles and of the polishing mass with which he is concerned. In regard to the quantity of the polishing mass, in order that the process shall be carried out to

the best advantage, Uebersax states that it should be such that the article is substantially covered by the mass during rotation."

Obviously the gist of the invention is that the article to be polished remains, during the process, suspended in the polishing mass, instead of being thrown in and out of the mass and against the sides of the revolving drum as well as against other articles subjected at the same time to the polishing process. The plaintiff's claim is that by the Uebersax process the article polished is touched only by the polishing mass, consisting of smooth steel balls and pins and soapy water; that therefore awkwardly shaped articles, like coffeepots, ramekin dishes, platters, etc., are never scratched or deformed; and that the plate is not worn off, as in the case of hand or brush polishing— formerly the only methods used in hotels and restaurants for polishing such utensils.

There is no doubt that the patent owners have made a commercial success in selling machinery adapted for this process. The sales of such machines up to October 15, 1918, amounted to nearly $500,-000, the installations including many of the large hotels of the country, such as the Biltmore, the Ritz-Carlton, the Waldorf-Astoria in New York City, the Bellevue-Stratford, and other leading Philadelphia hotels. These installations cost from about $2,000 to over $15,000 for each hotel.

The invention, if it be such, has evidently come into pretty general use, and has largely superseded the earlier and less economical and efficient polishing processes. Defendant's counsel concede the utility, but deny the invention. They say in their brief:

"It may be conceded that the plaintiff was the first to apply the steel ball polishing process to plated silverware commercially."

It requires but brief and superficial consideration of the prior art to conclude that the process as above described is a real invention. All of the prior uses, patented and unpatented, were but variations of the long-used method of mass polishing by using tumbling barrels or revolving or oscillating drums. Ashley of the Scoville Manufacturing Company as early as 1901 used steel balls and a hexagonal horizontal barrel for polishing fragile metal articles like collar buttons. But his process was the indiscriminate filling of the drum with buttons and balls and soapy water, so that the actual polishing was by the contact of button with button and of button with drum as well as of button with ball. He filled, or nearly filled, his barrel, and then caused the contents to be churned.

Barton's process, used since 1903, of polishing jewelry, was also mass polishing, using a corrugated drum, so that the jewelry must have been constantly struck by the revolving corrugations in the barrel. This was another churning process.

The Baird machine, 1907, was, in use, nearly filled with steel balls and articles like corset trimmings, buckles, etc. This again was nothing but mass polishing.

When, after Abbott had reduced the cost of steel balls, their use in larger quantities was advocated, in 1910, in the "American Machinist," the process described was still mass burnishing—"the whole

mass of soap, work, and balls is tumbled about, causing the balls to be forced in all directions across all of the work surfaces, thus giving a constant burnishing action." This is very different from the Uebersax process of "avoiding almost the radial displacement of the said articles, and consequently of preventing them from getting out of shape."

In none of these or other earlier uses described in the record can be found the process of suspending the article in the polishing mass so that the polishing mass, and only the polishing mass, was in contact with the articles to be polished. Cf. The Barbed-Wire Patent, 143 U. S. 275, 285, 12 Sup. Ct. 443, 36 L. Ed. 154. None of the old processes were adapted to polishing large, easily deformed articles.

Indeed, careful consideration of the very able brief and argument of defendant's counsel constrains me to the view that their main reliance is, as it must be, upon the alleged legal insufficiency of the patent to cover the new and successful process exploited by the plaintiff and its predecessors in title. The defendant's contentions upon this point fall conveniently under two heads:

[3, 4] (1) That the "written description" in the patent fails to meet the statutory requirement, section 4888, Rev. St. (Comp. St. § 9432), of a statement "in such full, clear, concise,. and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same." As part of this contention the defendant urges that the claim is void as extending beyond the description (Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 243 Fed. 869, 156 C. C. A. 373); that the claim inserts an element not described, to wit, rotating the article in the mass; maintaining article central of the mass; also that the claim is void as being nothing but for the function of a machine. American Lava Co. v. Steward, 155 Fed. 731, 84 C. C. A. 157.

(2) That even if the patent, as finally issued, is legally sufficient, it is made so only by an amendment filed April 10, 1913, more than two years after the original filing, drawn by a newly appointed agent for the applicant, and not verified by oath. In support of this contention defendant's counsel refer to the file wrapper and contents. From the file wrapper, page 27, it appears that on April 10, 1913, the original application was amended by inserting as follows:

"The utensils have such relation to the polishing mass in specific gravity as to be kept approximately central of the drum in its rotation, and will neither fall to the bottom nor rise to the top in rotation of the drum, and hence are kept from contact with the walls of the drum and prevented from being deformed in any way. The speed of rotation varies according to the character of the article; that is, a perfectly round article would still remain central whether the speed be high or low, but an article having projections, such as a water pitcher or the like, would be dislodged from an absolutely central position due to the irregular action upon the projecting parts, and hence the rotation is adjusted to a comparatively low speed, which will not materially dislodge any articles which it is desired to clean from the approximately normal central position during rotation."

Also by striking out the two original claims, which covered both the process and the apparatus used therefor, and inserting the following claim:

"The method herein described of polishing articles, consisting in subjecting the articles to rotation while suspended within a polishing mass, the relative specific gravity of the articles and polishing mass being such as to maintain the articles approximately central of the polishing medium during rotation, substantially as described."

These amendments were made after the examiner had, on July 17, 1911, rejected the claim for lack of patentable novelty, the examiner saying:

"The process claimed appears to involve no more than the operation of any rumble in the ordinary manner after the same has been charged with a solvent (soap solution), the objects to be cleaned, and abrading elements of a special form. The quantity of solvent employed and that of the abrading elements (pins and balls), as well as the particular shape of the latter, are held to be matters of choice and not of invention, and not to affect the character of the 'process' as such; nor do they involve any substantial or patentable physical or structural difference over the solvents and abrading elements disclosed in the references."

After this amendment had been made and' the case' reargued by new counsel, the examiner adhered to his adverse view, holding that the claim had not been amended in substance. Thereupon an appeal was taken to the Board of Examiners in Chief, and there reargued orally and in writing. The Examiners in Chief, on May 3, 1913, sustained the appeal, saying:

"Appellant has invented a new process of polishing silver utensils and other similar articles, although he has used an old apparatus for carrying this process into effect. He employs a barrel not unlike a tumbling barrel, this barrel containing a mass of steel balls and soapy water, in which mass the utensils are submerged. The balls are of steel, and are not new per se as a means for polishing articles of silver or similar metals. They are, however, new in respect to their relative specific gravity, which is such that the utensils remain centrally within the mass of balls and do not come into contact with and become scratched by the inside of the barrel.

"We believe that appellant has used old elements of the art in a new way, with an attendant result which has not been and could not be produced by the patentees, and that he is entitled to a patent.

"The examiner refers to parts of the specification which have been introduced by amendment. He regards these as new matter, but, as appellant states that he will withdraw or cancel the amendments, it would be unnecessary to consider them, even if we had jurisdiction of the question."

The "new matter" refers, not to the amendment above set forth, which was marked "E," but to an amendment "G," filed on April 15, 1913, and referring to a drum of 16 sides, and to the relation of the size or other characteristics of the articles dealt with and the size of the drum, its speed of rotation, and the number of its sides. This proposed amendment "G" was struck out as admittedly new matter. But it does not appear to have occurred either to the examiner or to the Board of Appeal that the amendment now attacked was new matter and as such unwarranted by the original disclosure. It is true, as contended by defendant's counsel, that specific gravity was not mentioned in the original application. Neither is speed of rotation specifically described either in the original or in the amended application. It is also true that the plaintiff's counsel now support their contention by elaborate testimony from their expert, Prof. Johnston, that speed of

rotation and relative specific gravity of the mass and of the article to be polished are both requisite elements in the process of suspending the body to be polished within the polishing mass. It is also a part of the plaintiff's contention that, if the drum be rotated too rapidly, the process will not be performed. Tests were made by Prof. Johnston showing that, when an article having a specific gravity substantially greater than that of the polishing mass, and spherical or nearly so, was inserted in the polishing mass, a higher speed of rotation could be used without destroying the process than when the article sought to be polished is of less specific gravity or nonspherical shape.

The question whether the process now used and described by the plaintiff's expert is sufficiently disclosed in the patent, either with or without the amendment, I regard as fairly close. No dogmatic or entirely confident conclusion have I been able to reach. But, on the whole, I think the weight of argument is in favor of the sufficiency and validity of the patent.

The original application before amendment plainly disclosed that the process described contemplated that "the steel balls and pins" should be—

"employed in such quantities that they always completely cover the silver utensils during rotation of the drum for the purpose of avoiding almost the radial displacement of the said articles and consequently of preventing them from getting out of shape. Consequently the position of each utensil to be polished relatively to the longitudinal axis of the drum is not changed during the rotation of this latter, the steel balls and pins effecting only a restrained and slow displacement along the surfaces of the utensils to be polished."

This language shows that the object sought to be achieved was the prevention, or substantially that, of the "radial displacement of said articles." The gist of the new idea was the use of the steel-ball tumbling process without, so to speak, tumbling the article out of the polishing mass. There was to be "only a restrained and slow displacement along the surfaces of the utensils to be polished." It follows, I think, that the subsequent amendment referring to the relative specific gravity of the polishing mass and of the articles to be polished is to be regarded as merely an amplification or explanation of the fundamental concept contained in the original application. In fact the specific gravity of ordinary silver, such as is used in utensils, all of which are really base metal plated, is greater than the specific gravity of the polishing mass, because of the fact that the interstices between the balls are filled only by soapy water, much lighter of course than the material to be polished. In practical application, therefore, little attention need be paid to the relative specific gravity of the polishing mass and the article.

If a hollow pitcher is to be polished, the operator would naturally submerge it in the polishing mass, so that the pitcher itself would be filled.

The language of the court in Fullerton W. G. Ass'n v. Anderson-Barngrover Mfg. Co., 166 Fed. 443, 449, 92 C. C. A. 295, 301, is in point:

"The inventor was not required to specify how the process could be most economically used. It was enough if he so described it that one skilled in the

art could use it. It may be conceded that clearer information would have been afforded if the precise proportions of each solution had been indicated, but we are not prepared to say that for want of such precise information the patent should be held void. A patent for a process is not to be held to the strictness of specification required in a patent for a composition, and the decisions holding void applications for patents of the latter class are not necessarily applicable to process patents. We think that one skilled in the art of bleaching could, from the terms of the specification, without further information, make a compound solution such as would render the process practicable. The specification is not, we think, more indefinite or uncertain than those which were sustained in Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279, and Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968. In the first of these cases Mr. Justice Bradley said:

"'The mixing of certain substances together, or the heating of a substance to a certain temperature is a process. If the mode of doing it, or the apparatus in or by which it may be done, is sufficiently obvious to suggest itself to a person skilled in the particular art, it is enough, in the patent, to point out the process to be performed, without giving the supererogatory directions as to the apparatus or method to be employed.'

"In the second case Mr. Justice Brown said:

"'The specification of the patent is not addressed to lawyers, or even to the public generally, but to the manufacturers of steel; and any description which is sufficient to appraise them in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent.'"

The original application did not in terms state that the speed of rotation should be varied according to the character or shape of the article; whereas the amendment does set forth that "an article having projections, such as a water pitcher or the like, would be dislodged from an absolutely central position, due to the irregular action upon the projecting parts; and hence the rotation is adjusted to a comparatively low speed, which will not materially dislodge any articles which it is desired to clean from the approximately normal central position during rotation." This, again, is but an explanation or a specification of a method of achieving the result set forth, although somewhat meagerly, when in the original application reference is made to "avoiding almost the radial displacement," and "effecting only a restrained and slow displacement along the surfaces of the utensils to be polished."

Even if some experiment on the part of the operator should be found necessary in order to determine the speed requisite for the successful performance of the process, this would not, under the authorities, invalidate the patent. In the Minerals Separation Case, 242 U. S. 261, 270, 37 Sup. Ct. 82, 86 (61 L. Ed. 286), the court said, as to a similar contention:

"Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances, and the range of treatment within the terms of the claims, while leaving something

to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law. Mowry v. Whitney, 14 Wall. 620 [20 L. Ed. 860]; Ives v. Hamilton, 92 U. S. 426 [23 L. Ed. 494]; and Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 437 [22 Sup. Ct. 698, 46 L. Ed. 968]."

I conclude, therefore, that the substance of the process was set forth in the original application; that the amendment falls within the scope of permissible amendments, and not of new matter; and that it is therefore immaterial whether it was or was not verified by oath.

The language of the Court of Appeals of the Sixth circuit in the case of General Electric Co. v. Cooper Hewitt Electric Co., 249 Fed. 61, 64, 161 C. C. A. 121, 124, is in point:

"The claims, as issued, are made to depend in part upon these things not originally specified. Hence it is plausibly argued that the insertion was of new matter and was vital to the invention as patented; and thereupon it is said that the patent is void. Railroad v. Sayles, 97 U. S. 554, 563, 24 L. Ed. 1053; Railroad v. Consolidated Co. (C. C. A. 6) 67 Fed. 121, 129, 14 C. C. A. 232. This view overlooks the substance of the invention, as disclosed in the original specification and drawing. The rule is that insertions by way of amendment in the description or drawing, or both, do not hurt the patent, if the insertions are only an amplification and explanation of what was already reasonably indicated to be within the invention for which protection was sought—'something that might be fairly deduced from the original application.' Hobbs v. Beach, 180 U. S. 383, 395, 21 Sup. Ct. 409, 45 L. Ed. 586; Cleveland Co. v. Detroit Co. (C. C. A. 6) 131 Fed. 853, 857, 68 C. C. A. 233; Proudfit Co. v. Kalamazoo Co. (C. C. A. 6) 230 Fed. 120, 123, 144 C. C. A. 418; Cosper v. Gold, 36 App. D. C. 302. When we seek to apply this rule in this case, we first observe that the alleged new matter was not only permitted by the Patent Office, but was required, because an element claimed was not shown or sufficiently described. The Patent Office has a strict rule on this subject. It fully recognizes that new matter must not be permitted, and it is constantly engaged in defining what is and what is not new matter. The application of the rule must, of necessity, be more or less arbitrary, and the presumption of correctness which attends Patent Office rulings must apply with especial force to this class of ruling; and most peculiarly is that true when the applicant has only complied with the demands which the Patent Office made."

In Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 Fed. 853, 68 C. C. A. 233, the court said:

"If an inventor comes to better understand the principles of his invention while his application for a patent is pending, an amendment of his claims to conform thereto does not introduce any original matter nor enlarge his invention, and is within his legal right."

Compare, also, Eagleton Mfg. Co. v. West, etc., Mfg. Co., 111 U. S. 490, 4 Sup. Ct. 593, 28 L. Ed. 493; Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139; Mine & Smelter Supply Co. v. Braeckel Concentrator Co. (D. C.) 197 Fed. 897; American Steel Foundries v. Wolff Truck Frame Co. (C. C.) 189 Fed. 601, 602; Hoe et al. v. Kahler (C. C.) 25 Fed. 271, 279; Emerson, Smith & Co. Ltd., v. Lippert (C. C.) 31 Fed. 911; Wayne Mfg. Co. v. Coffield Motor Washer Co., 227 Fed. 987, 142 C. C. A. 445; Empire Cream Separator Co. v. Sears, Roebuck & Co. (C. C.) 157 Fed. 238, 240; Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U. S. 428, 434, 31 Sup. Ct. 444, 55 L. Ed. 527; Railroad Supply Co. v. Hart Steel

Co., 222 Fed. 261, 273, 274, 138 C. C. A. 23; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 423, 22 Sup. Ct. 698, 46 L. Ed. 968.

In view of my conclusion upon this point, it is unnecessary for me to undertake to determine whether an alleged infringer is or is not permitted thus collaterally to attack the patent. Compare the Eastern Paper Bag Co. v. Continental Paper Bag Co. (C. C.) 142 Fed. 479, 511; Id., 150 Fed. 741, 80 C. C. A. 407; Id., 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122; Western Glass Co. v. Schmertz Wire-Glass Co., 185 Fed. 788, 109 C. C. A. 1.

The patent is at any rate presumptively valid. It makes a prima facie case. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 498, 23 L. Ed. 952; Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, 274, 138 C. C. A. 23; Consolidated Contract Co. v. Hassam Pav. Co., 227 Fed. 436, 440, 142 C. C. A. 132; Minneapolis, St. P. & S. S. Ry. Co. v. Barnett & Record Co., 257 Fed. 302, 307, —— C. C. A. ——; Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939.

[5] What has been said also disposes of the defendant's claim that under Patent Office rule 48 the amendment of April 10, 1913, should have been verified by oath. That rule provides that when an applicant presents a claim for matter originally shown or described, but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath to the effect that the subject-matter of the proposed amendment was part of his invention. Such supplemental oath must be attached and must properly identify the proposed amendment.

As already pointed out, I think the present claim does not cover anything "not substantially embraced in the statement of invention or claim originally presented." Consequently it is immaterial that the file-wrapper does not disclose that the amendment of April 10, 1913, was verified by oath. This conclusion makes it unnecessary to determine whether the plaintiff is correct in its contention that this defense is not open because not set up in the answer.

My conclusions on the whole case are that it falls within the principles laid down by the Supreme Court in Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034, and Minerals Separation Co. v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286, and cases cited and reviewed in these two leading opinions.

See, also, Minneapolis, St. P. & S. S. Ry. Co. v. Barnett & Record Co., 257 Fed. 302, 306, —— C. C. A. ——, and cases cited.

In the Expanded Metal Co. Case the court said (214 U. S. 381, 29 Sup. Ct. 655, 53 L. Ed. 1034):

"It is suggested that Golding's improvement, while a step forward, is nevertheless only such as a mechanic skilled in the art, with the previous inventions before him, would readily take, and that the invention is devoid of patentable novelty. It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question. If this were the rule, many of the most beneficial patents would be stricken down It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed after repeated efforts to discover a certain new and useful improvement, that he who first makes the discovery

has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Loom Company v. Higgins, 105 U. S. 580–591 [26 L. Ed. 1177].

"To our minds, Golding's method shows that degree of ingenuity and usefulness which raises it above an improvement obvious to a mechanic skilled in the art, and entitles it to the merit of invention. Others working in the same field had not developed it, and the prior art does not suggest the combination of operations which is the merit of Golding's invention."

In the Minerals Separation Case the court said (242 U. S. 268, 37 Sup. Ct. 85, 61 L. Ed. 286):

"The present invention differs essentially from all previous results. * * *
"It is not necessary for us to go into a detailed examination of the process in suit to distinguish it from the processes of the patents relied on as anticipations, convinced, as we are, that the small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case in prior processes, but that this force is to be found chiefly in the buoyancy of the air bubbles introduced into the mixture by an agitation greater than and different from that which had been resorted to before, and that this advance on the prior art and the resulting froth concentrate so different from the product of other processes make of it a patentable discovery as new and original as it has proved useful and economical."

This Uebersax process has been patented in Switzerland and in Great Britain. It has achieved a commercial success in Europe and in America. Within the principles enunciated in the leading cases, it is a new and useful invention.

There must be a decree for the plaintiff, with costs.